COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO.

CAMPUS STORES OF MASS., INC.,

Plaintiff,

v.

FOLLETT HIGHER EDUCATION GROUP,
INC.

Defendant.

**MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

## INTRODUCTION

In connection with the potential purchase of Plaintiff's college bookstore business, Defendant Follett Higher Education Group, Inc. ("Follett") signed a Confidentiality and Nondisclosure Agreement (the "Agreement") in which it agreed:

- It would be receiving from Plaintiff Campus Stores of Mass., Inc. ("Campus Stores") Confidential Information such as customer lists, customer contract information including expiration dates, sales data, profitability analysis, marketing plans and staffing models.

- It would keep this information strictly confidential and would not use it "for any competitive purposes."

- It would not "contact, solicit or accept business from" Campus Stores' customers.

- That injunctive relief was appropriate to prevent any "breach or threatened breach of any provisions of this Agreement."

Follett has breached the Agreement by contacting and soliciting the business of Curry College, one of Campus Stores' customers. Campus Stores has demanded that Follett cease and desist its efforts to procure the Curry College contract, but Follett has failed to give any assurances it has done so.

Given Follett's calculated efforts to raid Campus Stores' customer base and its conscious disregard of its clear contractual obligations, Campus Stores is forced to come to this Court to obtain an injunction preventing Follett from contacting, soliciting or accepting business from Campus Stores' customers including, but not limited to, Curry College.

**FACTS**

**A.    Campus Stores and Follett Enter Into Discussions Regarding Follett's Potential Acquisition of Campus Stores' Business.**

Campus Stores is a local company which operates bookstores on ten college campuses in Massachusetts and New Hampshire. (See Verified Complaint at ¶ 3.) Follett, on the other hand, is the largest operator of campus bookstores in the world, with stores on more than 700 campuses across the nation. (Ver. Cmplnt. at ¶ 4.)

In or about 2003, Campus Stores attempted to sell its business. (Ver. Cmplnt. at ¶ 5.) As part of an organized sales process, Campus Stores required prospective purchasers to sign a Confidentiality Agreement before they were given access to certain confidential information concerning Campus Stores' business ("Confidential Information"). (Ver. Cmplnt. at ¶ 5.) The Confidential Information included, but was not limited to, information regarding the identity of the host colleges with which Campus Stores had contracts, the financial terms of each relationship, the commission structure, staffing models, profit margins and the dates that each contract was to expire. (Ver. Cmplnt. at ¶ 5.) Campus Stores was concerned that a prospective purchaser unfairly could use such information to its competitive advantage in future bidding

contests. (Ver. Cmplnt. at ¶ 6.) For example, a competitor could structure its bid so as to exceed

the financial benefits that it knew the college had been receiving from Campus Stores. (Ver.

Cmplnt. at ¶ 6.) In order to eliminate this risk and to protect its existing and future relationships,

Campus Stores required all prospective purchasers to sign a Confidentiality Agreement in

consideration for access to its Confidential Information. (Ver. Cmplnt. at ¶ 6.)

### B.    Follett Enters Into Confidentiality Agreement.

On or about July 23, 2003, Defendant Follett entered into a Confidentiality and

Nondisclosure Agreement (the "Agreement") with Campus Stores, a copy of which is attached

hereto as Exhibit A. (Ver. Cmplnt. at ¶ 7.) The Agreement contains the following key

provisions:

3.      The parties agree that any Confidential Information received or acquired
by one party (the "Receiving Party") from the other party (the "Disclosing
Party") hereunder, shall be held in trust and confidence for the Disclosing
Party and Receiving Party shall not, without the prior written consent of
the Disclosing Party, disclose such Information to anyone, nor use such
Information for any purpose except in connection with the activities
contemplated by this Agreement.

10.     [...] Furthermore, the Receiving Party shall not use any Confidential
Information of the Disclosing Party for any competitive purposes. **Follett-
HEG agrees not to contact, solicit or accept business from, either
directly or indirectly, Campus Stores' suppliers, customers or host
colleges through the close of the next round of contract bidding for
each such supplier, customer or host college.** The restriction in the
immediately preceding sentence shall be applicable only with respect to
the first time each of such contracts come up for bid or renewal following
the date of this Agreement.

11.     In the event of any breach or threatened breach of any provision of this
Agreement, the Disclosing Party shall be entitled to immediate temporary,
preliminary and/or permanent injunctive relief to prevent any such breach
or threatened breach, in addition to any other relief available at law or at
equity.

12.     The Receiving Party indemnifies and agrees to hold the Disclosing Party
harmless from and against any and all losses, damages, liabilities, costs

and expenses, including attorneys' fees, incurred by the Disclosing Party, arising out of or relating to the breach by the Receiving Party of any of the agreements contained herein.

(Emphasis added). (Ver. Cmplnt. at ¶ 7.) Based upon Follett's covenants as set forth in the Agreement, Campus Stores provided Follett with a 41 page Confidential Offering Memorandum setting forth extensive confidential information including financial data for each of Plaintiff's accounts, profit margins, staffing models, commission structures, operating expenses, and the dates each contract was to expire. (Ver. Cmplnt. at ¶ 8.)

**C.     Follett Contacts Campus Stores for Permission to Pursue Nichols College.**

In 2004, Campus Stores' contract with Nichols College expired. (Ver. Cmplnt. at ¶ 9.) At or about that time, a representative from Follett sought permission to bid on the Nichols College account. (Ver. Cmplnt. at ¶ 9.) Campus Stores declined to grant Follett this permission, and invoked the provisions of the Agreement as set forth above. (Ver. Cmplnt. at ¶ 9.) Follett acknowledged the enforceability of the Agreement, and indicated that it would abide by its covenants not to solicit or accept business from Campus Stores' host colleges. (Ver. Cmplnt. at ¶ 9.) Upon information and belief, Follett ceased its pursuit of the Nichols College account. (Ver. Cmplnt. at ¶ 9.)

**D.     Follett Breaches the Agreement by Negotiating with Curry College.**

For approximately 25 years, Campus Stores has had a contract with Curry College and has enjoyed an overall favorable relationship with the school. (Ver. Cmplnt. at ¶ 10.) Campus Stores' current contract with Curry College was set to expire on May 31, 2005, a fact made known to Follett vis-à-vis the confidential disclosure detailed above. (Ver. Cmplnt. at ¶ 10.) Until very recently, Curry College had never indicated that it did not intend to renew Campus Stores' contract. (Ver. Cmplnt. at ¶ 10.) In fact, as recently as February 2005, Campus Stores

received a letter from Curry College in which the college made clear that Campus Stores was part of its future plans beyond May 2005. (Ver. Cmplnt. at ¶ 10.) Then, in or about early May 2005, Campus Stores learned that Follett was in the process of soliciting or negotiating an agreement with Curry College, in direct violation of its covenants to Campus Stores pursuant to the Confidentiality Agreement. (Ver. Cmplnt. at ¶ 11.) By letter dated May 5, 2005, counsel for Campus Stores wrote to Thomas Christopher, the president of Follett, to demand that Follett immediately cease and desist from further negotiations with Curry College. (Ver. Cmplnt. at ¶ 11.)

Follett did not send a written response, and to date, has not denied that such negotiations were taking place. (Ver. Cmplnt. at ¶ 12.) In fact, counsel for Follett proposed an arrangement whereby Follett would pay Campus Stores to release the restriction preventing Follett from negotiating with Curry College and to buy Campus Stores' inventory in its Curry College store for an amount in excess of inventory cost. (Ver. Cmplnt. at ¶ 13.) Campus Stores rejected that offer, and indicated that it intended to continue its business with Curry. (Ver. Cmplnt. at ¶ 13.)

Immediately thereafter, in sharp contrast to Curry College's prior encouragement to submit a bid to renew the contract, Campus Stores received a letter dated May 18, 2005 from Curry College indicating for the first time that it was apparently dissatisfied with Campus Stores and that it intended to pursue a relationship with a "large national bookstore chain" *i.e.*, Follett, instead of continuing on with Plaintiff. (Ver. Cmplnt. at ¶ 14.) This letter was faxed to Campus Stores approximately two hours after its counsel had concluded a telephone conversation with Follett's counsel in which Curry's intentions regarding Campus Stores was discussed. (Ver. Cmplnt. at ¶ 14.) Upon information and belief, Curry College's decision to send this letter at this

time was precipitated by, or, at a minimum, improperly influenced by Follett's involvement. (Ver. Cmplnt. at ¶ 15.)

## ARGUMENT

Massachusetts courts will enforce a restrictive covenant with regard to the sale of a business as long as it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest. *See Marine Contrs. Co. v. Hurley*, 365 Mass. 280, 287-288, 289, (1974); *All Stainless, Inc. v. Colby*, 364 Mass. 773, 778 (1974). Legitimate business interests include protection of trade secrets, confidential information, and good will. *Marine Contrs. Co. v. Hurley*, 365 Mass. at 287. Courts look "less critically" at restrictive covenants arising from the sale of a business because, unlike employers and employees, buyers and sellers are likely to be similarly-situated, with equal bargaining power and often times the benefit of counsel. *Boulanger v. Dunkin' Donuts Inc.*, 442 Mass 635, 640 (2004). Courts consider whether "the parties entered into the agreement with the assistance of counsel and without compulsion." *Wells v. Wells*, 9 Mass.App.Ct. 321, 323-325 (1980).

Campus Stores is entitled to preliminary injunctive relief to enforce the restrictive covenants in the Agreement because it can demonstrate: (1) a likelihood of success on the merits of its claim that Follett breached, or is threatening to breach, the Agreement; (2) a substantial risk that Campus Stores will suffer irreparable harm in the absence of the requested injunction; and (3) that the gravity of the risk of harm to Campus Stores, considered in the light of its chances of success, outweighs the risk of harm to Follett. *See GTE Products Corp. v. Stewart*, 414 Mass. 721, 722-23 (1993); *Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 617 (1980). Moreover, enforcement of the Agreement through an injunction is necessary in order to protect Plaintiff's legitimate business interests – specifically its Confidential Information and its goodwill.

- 6 -

**I.    CAMPUS STORES IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST FOLLETT.**

**A.    Follett Knowingly and Intentionally Breached the Agreement**

Campus Stores anticipated the serious risks that could result from providing competitors with access to its Confidential Information and thus it took steps to avoid such risks by requiring interested parties such as Follett to enter into the Confidentiality Agreement. By its express, unambiguous terms, the Agreement provides that (1) Plaintiff's customers and contract information constitute Confidential Information; and (2) that the Receiving Party would not "contact, solicit or accept" business from Plaintiff's customers for a defined period. In doing so, potential purchasers would obtain a fully informed view into Campus Stores' operations to assess the value of its business, and Campus Stores would have the peace of mind that the potential purchasers would not later misuse the information to gain an unfair competitive edge over Campus Stores. By stipulating that these restrictions would apply only to Campus Stores existing contracts, and would remain in place only with respect to the first time each of those contracts came up for bid or renewal, the parties narrowly tailored the agreement so as to avoid any unreasonable restraint on trade.

Follett's conduct with respect to the Nichols College account demonstrates that Follett is well aware of the restrictions in the Agreement. Only a year ago, Follett contacted Campus Stores to ask permission to contact and solicit the Nichols College account. In doing so, Follett expressly acknowledged the existence and enforceability of the restrictions imposed by the Agreement. Further, given that Campus Stores refused to permit Follett from pursuing that account, Follett was put on notice that Campus Stores intended to enforce the protections afforded by the Agreement.

Presently, Follett has elected not to seek Campus Stores' permission to pursue another of its accounts, Curry College, likely knowing that Campus Stores would again object to such pursuit. In doing so, Follett has breached the Agreement. This is the exact type of predatory conduct which prompted Campus Stores to require potential purchasers to sign the Confidentiality Agreement. There can be no dispute that Follett has been in contact with Curry College for the purpose of soliciting its business, and therefore that Follett has breached the Agreement. There is also no doubt that, if awarded the contract by Curry, Follett will accept Curry's business. When accused by Campus Stores of such involvement, not only did Follett fail to deny its involvement, it actually offered to purchase Campus Stores' inventory at a price in excess of the inventory's value, likely in anticipation of replacing Campus Stores as the bookstore operator at that college. As such, Campus Stores has demonstrated a reasonable likelihood of succeeding on the merits of its breach of contract claim against Campus Stores.

## II.    CAMPUS STORES WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT ISSUE THE REQUESTED INJUNCTIVE RELIEF.

The goal of a preliminary injunction is to minimize the risk of irreparable harm to the moving party. *Packaging Industries,* 380 Mass. at 617, n. 12. In the absence of an injunction, Campus Stores will suffer irreparable harm because it may well lose all of its business to Follett's predatory tactics. As stated above, Campus Stores only has contracts concerning ten stores. Each contract is therefore vital to Plaintiff's continued existence. An injunction is critical to preserving Campus Stores' remaining goodwill and business and to prevent Follett from benefiting from the fruits of its contractual violations. Here, the parties recognized the importance of the information and agreed that injunctive relief was the appropriate remedy to protect that information. Where two commercially sophisticated parties knowingly agree to the

entry of injunctive relief to protect confidential information, the Court should hold them to their agreement and enter an injunction.

### III.    THE RISK OF IRREPARABLE HARM TO CAMPUS STORES ABSENT THE REQUESTED INJUNCTION FAR OUTWEIGHS THE MINIMAL RESTRICTIONS THE INJUNCTION WOULD IMPOSE ON FOLLETT.

As described above, Campus Stores has established that it is reasonably likely to succeed on the merits of its claims against Follett. Moreover, Campus Stores has suffered and will continue to suffer irreparable harm absent injunctive relief. These factors weigh heavily in favor of granting Campus Stores the requested injunctive relief.

By contrast, an injunction would have minimal, if any, impact on Follett's business. Even if an injunction issues, Follett still would be free to pursue any of the hundreds of thousands of other colleges and universities nationwide. Rather, it would be prevented only from soliciting or doing business with these few colleges, and then, only until the first time each of Plaintiff's contracts come up for bid or renewal following the date of the Agreement. As such, the injunction would not prevent Follett from competing in the marketplace, as Follett would remain perfectly free, even in the same geographic area, to pursue any accounts other than the few at issue here.

Under these circumstances, the irreparable harm that Campus Stores would suffer absent the requested injunction far outweighs the minimal restrictions on Follett's business opportunities. As such, this Court should issue the requested injunction.

## CONCLUSION

For the reasons stated above, Campus Stores respectfully requests that the Court grant its

Motion for Preliminary Injunction and enter in the Order in the form attached thereto as

Exhibit A.

Respectfully Submitted,

CAMPUS STORES OF MASS., INC.

By its attorneys,

Christopher P. Litterio, BBO #551098
Bradley L. Croft, BBO #633347
RUBERTO, ISRAEL & WEINER, P.C.
100 North Washington Street
Boston, MA  02114
(617) 742-4200

Dated: May 26, 2005

I hereby certify that a true copy of the above
document was served upon the attorney of
record for each other party by mail by hand on
May 26, 2005

- 10 -