UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAMPUS STORES OF MASS., INC., | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 05-11116 NG |
| FOLLETT HIGHER EDUCATION GROUP, INC., | ) |
| Defendant. | ) |

**OPPOSITION OF FOLLETT HIGHER EDUCATION GROUP, INC.
TO CAMPUS STORES OF MASS., INC.'S
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

The defendant Follett Higher Education Group, Inc. ("Follett") hereby opposes the motion of plaintiff Campus Stores of Mass., Inc. ("Campus Stores") for a preliminary injunction, and submits in support hereof the affidavits of Kenneth K. Quigley, Jr. ("Quigley"), President of Curry College, and Joseph Flanagan, Follett's Vice President of Marketing for the Eastern Region.

Campus Stores seeks to enjoin Follett from entering into an agreement with Curry College ("Curry") to operate its campus bookstore, notwithstanding that Campus Stores was notified in September 2002 that its contract would terminate on May 31, 2005 and, more importantly, as its president firmly and unequivocally attests, that the college will not renew Campus Stores' contract under any circumstances. As the evidence set forth below establishes, Follett did not approach Curry for its business, did not utilize any confidential information, and did not induce or attempt to induce or otherwise influence the college's decision-making in this

matter. Follett submitted a proposal (within the last month and on the eve of the expiration of Campus Stores' contract) only after Curry made it abundantly clear that Campus Stores would not be renewed as its bookstore operator and would not be competing with Follett for the Curry contract.

Campus Stores' claims are baseless and are insufficient to support an action, let alone the extraordinary remedy of an injunction. Campus Stores cannot establish that it has a likelihood of success in proving that Follett breached the parties' agreement. Moreover, even if Campus Stores can overcome that hurdle and establish a technical breach, it has suffered no injury or damages as a direct and proximate result of any conduct on the part of Follett and it certainly cannot establish the irreparable harm necessary to support an injunction. The present action is a last-ditch effort to resuscitate a failed business relationship with the college (by, oddly enough, forcing Curry to continue with Campus Stores or face the prospect of having no store manager), and to seek to leverage (or, more appropriately extort) a windfall from a competitor.[1] Therefore, the present application must be denied.

## FACTUAL BACKGROUND

Campus Stores is a Massachusetts corporation located in Taunton, Massachusetts. Campus Stores operates and manages retail stores for ten colleges in Massachusetts and New Hampshire, including Curry College in Milton, Massachusetts. Verified Complaint and Jury Demand ("Complaint"), ¶¶ 1, 3, 10. Campus Stores began operating the bookstore at Curry pursuant to an agreement that originally had been executed on July 28, 1989 and subsequently renewed on several occasions. Affidavit of Kenneth K. Quigley, Jr. ("Quigley Aff."), ¶ 3. By September 2002, however, President Quigley had become unhappy with the operations of the

---

[1] Today, Campus Stores also threatened Curry with litigation if the college contracts with Follett for operation of its bookstore.

bookstore. *Id.*, ¶ 4. He was dissatisfied with the level and quality of the service provided by Campus Stores, its management of the store, and its overall performance as operator of the bookstore. *Id.* As a result, Quigley made the decision to terminate the Campus Stores agreement on its expiration date, which he believed was May 31, 2003, and transition the operations to one of the much larger national college bookstore operators, like Follett. Quigley believed then, and continues to believe today, that a larger national operator is better able to provide the technology, training and resources necessary to serve the needs of the college, its students and its faculty. *Id.*

As a result, Quigley authorized Curry's Chief Financial Officer, Richard Sullivan, to notify Campus Stores that Curry intended to terminate its contract. *Id.*, ¶ 5. By letter dated September 17, 2002, from Richard Sullivan to Eric Cressman, president of Campus Stores, Curry formally notified Campus Stores of the termination of its agreement effective May 31, 2003. Quigley Aff., ¶ 5 and Exhibit A attached thereto. Campus Stores responded by letter dated September 25, 2002. Based upon its interpretation of the agreement, Campus Stores took the position that the contract was scheduled to expire on May 31, 2005, not May 31, 2003. *Id.*, ¶ 6. Campus Stores confirmed, however, that it regarded Curry's September 17, 2002, letter to be a formal notice of termination effective May 31, 2005. *Id.* and Exhibit B attached thereto. Rather than challenge Campus Stores' interpretation of the term of the agreement, Quigley elected to allow Campus Stores to continue to operate Curry's bookstore through May 31, 2005, subject to the notice of termination issued on September 17, 2002. *Id.*, ¶ 7

Thereafter, in 2003, Campus Stores began to solicit suitors to purchase its business. Complaint, ¶ 5. In connection therewith, in July 2003, Campus Stores and Follett entered into a Confidentiality & Nondisclosure Agreement ("Agreement"). A copy of the Agreement is attached to the Complaint. Under the Agreement, Follett agreed not to contact, solicit or accept

3

business from, *inter alia*, Campus' host colleges through the close of the next round of contract bidding. Agreement, ¶ 10. This restriction was "applicable only with respect to the first time each of such contracts [i.e, Curry's contract] come[s] up for bid or renewal following the date of this Agreement." *Id.*

In preparation for the transition of the bookstore to a new operator, Quigley reached out to national bookstore operators, Follett and Barnes & Noble. Quigley Aff., ¶ 9. Specifically, by letter dated July 7, 2004, President Quigley first contacted Follett to explore the possibility of having Follett replace Campus Stores as the operator of Curry's bookstore. *Id.*, ¶ 10. Quigley approached Follett after interacting with Follett's bookstore at Fairfield University in Fairfield, Connecticut. *Id.*; Affidavit of Joseph Flanagan ("Flanagan Aff."), ¶ 6. Prior to Quigley's letter of July 7, Follett had neither contacted Curry nor in any way solicited Curry's bookstore business. Quigley Aff., ¶ 10; Flanagan Aff., ¶ 4.

In subsequent conversations with Follett representatives William Dowdy and Joseph Flanagan in or about August 2004, Quigley advised them that Curry's agreement with Campus Stores terminated effective May 31, 2005 and that he had no intention of continuing Curry's relationship with Campus Stores beyond May 31, 2005. Quigley Aff., ¶ 11; Flanagan Aff., ¶ 5. He told Follett that Curry was not happy with Campus Stores' performance and that Campus Stores did not have the resources or willingness to adapt to the evolving needs of the school. Flanagan Aff., ¶ 5. As he explained to Follett, it was his firm intention to transition the bookstore operations to a national bookstore chain. *Id.*; Quigley Aff., ¶11. In short, Quigley made it clear that, whether or not Follett was interested in taking over Curry's bookstore operations, Campus Stores had no future at the school. Flanagan Aff., ¶5. President Quigley further informed Follett that Curry was in the process of planning a new student center on

campus, which would include a prominent new space for the bookstore. He also stated that, in light of these plans, Curry was interested in partnering with a company with Follett's reputation and resources. Flanagan Aff., ¶ 6.

With the May 31, 2005 contract termination date approaching, on February 18, 2005, Quigley informed Follett that Curry was still planning to transition its bookstore operations to a new operator and that he perceived Follett to be Curry's likely partner in that effort. Quigley Aff., ¶ 12. Quigley subsequently solicited and, on or about March 31, 2005, received Follett's proposal for the management of the bookstore. No one at Follett had communicated with anyone at Curry between August 2004 and the receipt of Quigley's February communication. Flanagan Aff., ¶ 8. At President Quigley's request, Follett arranged to attend another meeting at which Curry's Director of Buildings & Grounds, Bob O'Connell, would be present in order for the college to gain an understanding of Follett's needs for both the temporary bookstore space that was soon to be constructed and the eventual-new space in the forthcoming student center. Dean Sue Pennini, who was in charge of Curry's strategic planning, would be present at the meeting. *Id*. ¶9.

The meeting subsequently took place on March 11, 2005. Flanagan attended along with Amanda Chase, one of Follett's Regional Managers, and Tim Walkup, Follett's Vice President of Store Planning, who was present to answer Bob O'Connell's questions. Representing Curry at this meeting were President Quigley, Bob O'Connell, Dean Sue Pennini, and the school's Chief Financial Officer, Richard Sullivan. *Id*., ¶ 10. At the outset of the meeting, President Quigley again responded that Curry had terminated Campus Stores' contract long ago. President Quigley indicated that he had sent Campus Stores a termination letter a year or so earlier, and even went so far as to retrieve and refer to the letter during our meeting. President Quigley made it clear

5

that Curry did not intend to have a relationship with Campus Stores once the existing contract expired, on May 31, 2005. *Id*., ¶ 11. At the end of the meeting, it was understood that Follett would prepare and submit a proposal for operation of the store, which it did on March 28, 2005. *Id*., ¶¶ 12-13.

A few days later, Tim Walkup received a communication from Bob O'Connell of Curry, seeking specific information regarding Follett's electrical needs for the temporary bookstore space. Flanagan Aff., ¶ 14. Although Follett had not been informed that Follett's proposal had been accepted by Curry, it was clear that Curry was committed to securing Follett as the new operator for its bookstore. As a result, Flanagan advised Tim Walkup to provide the requested information. *Id.*

Unbeknownst to Follett, but consistent with what it had implied from the nature of its interaction with Curry, President Quigley had decided in early April 2005, shortly after receipt of Follett's proposal, to award the contract to Follett. Quigley Aff., ¶13. To that end, on May 9, 2005, President Quigley contacted Flanagan and indicated that Curry wanted to move forward with Follett. While there remained issues to be resolved and Follett still did not have a contract with Curry, it was clear that Follett and the college were moving in the right direction. Flanagan Aff., ¶ 15; Quigley Aff., ¶13.

In the meantime, Curry and Quigley had received a letter, dated April 26, 2005, from Eric Cressman, the president of Campus Stores, making Curry an offer to continue operation of the bookstore after the termination date of May 31, 2005. Quigley Aff., ¶14. The offer was not solicited by Curry and did not alter Curry's position regarding Campus Stores or its intention, which continued to be to transition bookstore operations to a national operator, specifically Follett. *Id*. In fact, Quigley viewed the April 26 letter from Campus Stores as a last-ditch effort

6

to save a contract that it knew had been lost long ago. *Id*. At no time after Curry terminated the Campus Stores contract on September 17, 2002, has Quigley or any other representative of Curry solicited a proposal from Campus Stores for the operation of the Curry bookstore after May 31, 2005. *Id*. Moreover, at no time after September 17, 2002, has Quigley had any intention of continuing the relationship with Campus Stores beyond May 31, 2005. *Id*. By letter dated May 18, 2005, Quigley again confirmed to Campus Stores that Curry would not be going forward with Campus Stores as a bookstore provider beyond the expiration of the contract on May 31, 2005. *Id*., ¶ 15 and Exhibit C attached thereto.

In its Complaint, Campus Stores alleges that it received a letter from Curry in February 2005 that somehow led it to believe that they had a chance to be Curry's bookstore operator after May 31, 2005. The letter, dated February 17, 2005, was sent by Quigley to Eric Cressman, as a courtesy to alert them to a certain public announcement that Quigley was about to make regarding Curry's future transition of the bookstore, first to a temporary location and then the soon-to-be-constructed new student center. Quigley Aff., ¶ 16 and Exhibit D attached thereto. The letter was not intended to suggest that Campus Stores had a future at Curry beyond May 31, 2005. *Id*. In fact, Curry does not intend to reverse the position it has taken since 2002 and suddenly continue its relationship with Campus Stores beyond May 31, 2005. *Id*., ¶ 17.

Significantly, at no time did anyone at Follett use any information, confidential or otherwise, that Follett had received from Campus during the parties' buy-out talks in 2003, in the course of Follett's discussions with Curry. Flanagan Aff., ¶ 17. Still further, there would have been no reason or opportunity to use such information or breach the Agreement, given that Curry made it clear from its very first meeting with Follett in August 2004 that Campus Stores was not

7

a competitor for the Curry contract and that, as a result, Follett would not be bidding against Campus for that contract. *Id.*

## ARGUMENT

To warrant a preliminary injunction, Campus Stores must establish: (i) it has a substantial likelihood of succeeding on the merits; (ii) absent the injunction there is a significant risk of irreparable harm, (iii) the balance of the hardships weighs in its favor; and (iv) the injunction will not harm the public interest. *Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co., Inc.*, 378 F.3d 29, 33 (1st Cir. 2004); *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *Lanier Professional Services, Inc. v. Ricci*, 192 F.3d 1, 3 (1st Cir. 1999). Irreparable harm is a necessary threshold showing for a preliminary injunction. *Charlesbank*, 370 F.3d at 162. The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely on Campus. *Id*. Where monetary damages are adequate to compensate for an injury, there is an adequate remedy at law and, accordingly, no irreparable harm. *Id.*; *Matrix*, 378 F.3d 34-35; *Ocean Spray Cranberries, Inc. v. PepsiCo., Inc.*, 160 F.3d 58, 61 (1st Cir. 1998). In this case, Campus Stores fails to reach the bar on any of the requirements for an injunction.

**A.    Campus Stores Cannot Demonstrate A Likelihood Of Success On The Merits.**

Campus Stores asserts the following claims against Follett: breach of contract and an implied covenant of good faith and fair dealing, interference with advantageous relations and violation of Chapter 93A. Given the facts, it is not surprising that Campus Stores spends little effort to convince the Court that it is likely to prevail on its claims. Indeed, its entire discussion is slightly over one page in length. Instead, Campus Stores seeks to color the Court's view by inappropriately revealing confidential settlement discussions in the hope that Follett's

8

willingness to discuss resolution of the matter to avoid the time and expense of litigation is deemed evidence of its acknowledgement of wrongdoing.[2] Nothing could be further from the truth.

### 1. **Follett Did Not Breach Its Contract With Campus Stores**

The general principle underlying the provision of the Agreement that Campus Stores now contends was breached, is that Follett would not interfere in the next round of bookstore bidding at institutions where Campus Stores had an existing contract *and a likelihood of retaining that contract*. At Curry, it is undisputed, based on the affidavit of President Quigley, that Campus Stores had no likelihood of retaining the bookstore contract beyond May 31, 2005. Indeed, Campus Stores had no likelihood of retaining the Curry contract since as early as 2002, well before it even entered into the Agreement with Follett. Therefore, Campus Stores cannot establish that Follett breached the Agreement.

Indeed, it is clear from that facts that Follett did not willfully disregard the Agreement with Campus Stores. Follett's involvement with Curry was bound to become public knowledge, at the time it took over the college's bookstore, if not sooner. Clearly, Follett was not trying to surreptitiously steal Campus Stores' business. Instead, Follett believed, in good faith, that Campus Stores had no future at Curry and was not a competitor for that bookstore. President Quigley confirmed that throughout the college's interaction with Follett, and does so again in his

---

[2] Follett does not agree with Campus Stores' version of the events related to the parties' settlement discussions. Moreover, after receipt of Campus Stores' Verified Complaint, counsel for Follett contacted plaintiff's counsel and objected to the inclusion of any averments related to those settlement discussions and demanded that Campus Stores file an amended complaint, striking any such information. Counsel for Campus Stores agreed to do so last week and again confirmed that it was going to do so as recently as today, but had not done so as of the time of this filing. Based on these representations, Follett has refrained from filing a motion to strike and trusts that any such averments will not be considered in connection with this motion and action.

9

affidavit here. Under these circumstances, Campus Stores is not likely to prevail on any of its claims.

>   2.   **Campus Stores Cannot Establish That It Will Suffer Any Harm Or Damages As A Result Of Any Conduct On The Part Of Follett.**

What is further evident from the facts is that, for all of its effort, Campus Stores' claims are doomed because, among other reasons, it did not (and will not) suffer any injury or damages as a result of any conduct on the part of Follett. Thus, Campus Stores cannot establish causation or damages, necessary elements of all of its claims.

>   a.   **Intentional Interference With Advantageous Relations.**

To prove tortious interference, Campus must establish (i) a business relationship or contemplated contract of economic benefit; (ii) the defendant's knowledge of the relationship; (iii) the defendant's intentional and malicious interference with it; and (iv) the plaintiff's loss of advantage directly resulting from the defendant's conduct. *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 634 (1st Cir. 1996). This tort, however, does not recognize a perpetual business relationship. *Id*. While a plaintiff does not have to prove a binding contract, there must be a reasonable expectancy of financial benefit, and not merely a subjective belief or hope. *Adcom Products, Inc. v. Konica Business Machines USA, Inc*., 41 Mass. App. Ct. 101, 107-09 (1996) (Kass, J. dissenting); *Powers v. Leno*, 24 Mass. App. Ct. 381, 385 (1987). Here, President Quigley makes it crystal clear that Campus Stores has no realistic expectation of a continued relationship with the college. Campus Stores' contract has expired and certainly Campus Stores does not argue that the college can somehow be compelled to extend its contract. Moreover, there is no evidence that Follett did anything to doom Campus Store's relationship. Campus Stores did that on its own. There is no evidence that Follett contacted Curry nor in any way solicited Curry's bookstore business. Quigley Aff., ¶ 10; Flanagan Aff., ¶ 4. Equally important,

Quigley made it abundantly clear to Follett that the Campus Stores' contract had been terminated and there was no prospect of that contract being renewed. Quigley Aff., ¶ 11.

Thus, Campus Stores cannot establish that Follett proximately caused the loss of its relationship with Curry. *Netherwood v. American Federation of State, County and Mun. Employees, Local 1725*, 53 Mass. App. Ct. 11, 21-22 (2001) (to prevail the acts complained of must be the proximate cause of the loss of the relationship).  For the same reason, Campus Stores has not suffered any damages. *Morochnick v. Quigley*, 17 Mass. App. Ct. 1035 (rescript), review denied 392 Mass. 1102 (1984) (actual damages are a necessary element of a claim of intentional interference with an advantageous business relationship); *Chemawa Country Golf, Inc. v. Wnuk*, 9 Mass. App. Ct. 506, 510 (1980) (plaintiff must show that he suffered damages as a consequence of the defendant's conduct).

Thus, because Curry terminated Campus Stores' contract and has refused, without any prompting from Follett, to further engage the company as its bookstore operator, there could be no violation of the Agreement by Follett in submitting a proposal to Curry.  Moreover, any such proposal could not be material to the loss of Campus Stores' relationship.  The principle is akin to the situation in cases involving misrepresentation where the alleged false assertion did not proximately case harm to the plaintiff.  As with intentional interference, proof of damages flowing from the misrepresentation is essential for recovery. *Poly v. Moylan*, 423 Mass. 141, 149 (1996).  In such cases, the courts have held that "[w]here a plaintiff does not prove that he is worse off than if there had been no misrepresentation he has not make out a case of deceit." *Poly*, 423 Mass. at 149 *quoting Connelly v. Bartlett*, 286 Mass. 311, 315 (1934).  So too here. Campus Stores cannot establish intentional interference (or a Chapter 93A violation for that

11

matter) because it would have lost the Curry business notwithstanding any conduct on the part of Follett.

In sum, Campus Stores' claim of intentional interference fails on every prong except Follett's knowledge of Campus Stores' former relationship with Curry.

### b. Chapter 93A

Campus Stores fares no better under Chapter 93A. As with intentional interference, causation and damages are required elements of a Chapter 93A claim. *Aspinall v. Philip Morris Companies, Inc.* 442 Mass. 381, 401 (2004); *Heller Financial v. Insurance Co. of North America*, 410 Mass. 400, 409 (1991). "In the absence of a causal relationship between the alleged unfair acts and the claimed loss, there can be no recovery [under Chapter 93A]." *Massachusetts Farm bureau Fedn., Inc. v. Blue Cross of Mass., Inc.*, 403 Mass. 722, 730-31 (1989); Gilleran, *The Law of Chapter 93A* (1989) § 4:14 at 145 (both but-for and proximate causation are required). In other words, Campus must show an actual loss of money or property proximately caused by the alleged wrongdoing. *Augat, Inc. v. Aegis, Inc.*, 417 Mass. 484, 488 (1994); *Gilleran, supra* at 145-46 ("Causation also includes the requirement that damages under 93A are limited only to those caused by a 93A violation. Damages under 93A do not include damages which were not causally connected to a 93A violation."). Again, without belaboring the point, there simply are no damages causally connected to any conduct of Follett, even assuming that its conduct of submitting a proposal to Curry after being assured that Curry's relationship with Campus Stores was over could somehow be deemed unfair, deceptive or anticompetitive.

In a contract setting, to show an unfair or deceptive act in the rough and tumble world of commerce requires evidence that a party to a contract acted with a pernicious purpose collateral

12

to enforcing contractual rights in an attempt to exact wrongfully from the other party something apart from what that party is due under the contract.  *See Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 473-74 (1991) (commercial extortion violates the implied covenant of good faith and fair dealing and c. 93A); *Wang Laboratories, Inc. v. Business Incentives*, 398 Mass. 854, 857-59 (1986) (extortionate, coercive breach of contract "constitutes an unfair act or practice for [Chapter] 93A purposes"); *Community Builders, Inc. v. Indian Motorcycle Assocs.*, 44 Mass. App. Ct. 537, 557-59 (1998) (coercive, extortionate behavior under a contract violates c. 93A); *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992).  Certainly, nothing in the facts would support a finding that Follett's conduct vis-à-vis Campus Stores was in any way malicious or coercive.  At best, on the facts, Campus Stores might be able to establish a technical or *de minimus* breach of the Agreement from which it did not suffer any damages, but it is well established that a mere breach of contract does not amount to an unfair or deceptive act under c. 93A.  *Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995); *Madan v. Royal Indemnity Co.*, 26 Mass. App. Ct. 756, 762, *rev. denied*, 404 Mass. 1103 (1989).

   c. **Breach of Contract and the Covenant of Good Faith and Fair Dealing**

Even if Campus Stores were able to prove a technical breach of the agreement, all it would be entitled to is nominal damages.  *See Flynn v. AK Peters, LTD*, 377 F.3d 13, 23 (1st Cir. 2004); *Page v. N.E. Telephone & Telegraph Co.*, 383 Mass. 250, 251-52, 418 N.E.2d 1217, 1218 (1981); *Damiano v. Nat'l Grange Mut. Liability Co.*, 316 Mass. 626, 629, 56 N.E.2d 18, 20 (1944).  Whatever may be said of Campus Stores' prospects on this claim, it certainly is clear that any breach by Follett cannot support the extreme remedy of an injunction.

Moreover, the implied covenant of good faith and fair dealing does not advance Campus Stores' case.  In order to prevail on that count, Campus Stores has to establish far more than that

Follett breached the parties' contract. Instead, Campus Stores must establish that Follett's conduct "implicat[es] a dishonest purpose, consciousness of wrong, or ill will in the nature of fraud." *Equipment & Systems for Industry, Inc. v. Northmeadows Construction Co., Inc.*, 59 Mass.App.Ct. 931, 932-33, 798 N.E.2d 571, 575 (2003) (citing *Nagel v. provident Mut. Life Ins. Co. of Philadelphia*, 51 Mass.App.Ct. 763, 768-69, 749 N.E.2d 710 (2001)). Campus Stores has not even attempted to establish that it has likelihood of satisfying this burden, and is highly unlikely to do so on these facts.

In short, Campus Stores has no likelihood of prevailing on the merits and its motion should be denied on this ground alone.

**B.     Campus Stores Cannot Establish Irreparable Harm.**

Campus Stores' main thrust on this score is essentially a scare tactic. It argues that it may suffer irreparable harm because it only has ten (actually nine) stores and may well lose all of its business. Memorandum in Support at 8. An injunction, it asserts, is critical to preserve its remaining good will and business and to prevent Follett from benefiting from the fruits of its contractual violation. *Id.* Importantly, Campus Stores does not allege that Follett has solicited business from or entered into any agreements with any of its other stores. Campus Store's perceived injury to its "good will" has everything to do with its own business practices and nothing whatsoever to do with any conduct by Follett.

Nor does Campus Stores attempt to explain why it lacks an adequate remedy at law and cannot be made whole in damages. In this regard, this case is somewhat similar to *Ocean Spray,*

*supra*, where the First Circuit noted that enforcement of contracts by injunction is the exception rather than the rule.³  160 F.3d at 61.

> Historically, equity would not supply relief where legal remedies sufficed, and damages at law usually do provide remedies for breach of contract.  A famous formulation is Justice Holmes's statement that '[t]he duty to keep a contract in law means a prediction that you must pay damages if you do not keep it, --and nothing else.'  Modern theorists have explained why it is often 'efficient' to limit the remedy to damages and exclude injunctive relief.

*Id*. (citations omitted).  That is not to say, as the Court in *Ocean Spray* points out, that injunctions are never appropriate in a contract claim; specifically where monetary damages will not afford complete relief, as in agreements for the sale of real property, or where the determination of damages are problematic or impossible to measure accurately. *Id* at 62-63.  For example, the *Ocean Spray* Court discussed *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989), in which case an injunction was upheld where the landlord threatened to construct a new retail space in a parking lot in front of K-Mart, contrary to the terms of a 20-year lease. 160 F.3d at 61.  The Court in *K-Mart* agreed that the loss of revenues resulting from diminished visibility, restricted access, less commodious parking, and the like were sufficiently problematic to defy precise dollar quantification." *Id.*  The *Ocean Spray* Court readily distinguished the *K-Mart* case.  In any event, Campus Stores makes no effort whatsoever to fit within the extreme circumstances that on rare occasion may justify an injunction.  As in *Ocean Spray* (where Pepsi could terminate its agreement in fairly short order), here there is no doubt that Curry College has terminated its relationship with Campus Stores and that under the Agreement Follett was restrained from soliciting Curry only until the next round of contract bidding.  In short, even

---

³ In *Ocean Spray*, the defendant PepsiCo breached its exclusivity obligations under an agreement whereby Pepsi agreed not to distribute any competing non-carbonated juice drinks.  Pepsi thereafter purchased Tropicana Products, Inc. and violated the agreement.  Ocean Spray's attempt to parlay this breach into a showing of irreparable harm was rejected by the Court. 160 F.3d at 59-63.

15

assuming that Campus Stores has suffered any damages whatsoever, it is evident that such minimal damages are of short duration and easily calculable. As Campus Stores has a potentially adequate remedy in damages, there is no irreparable harm and thus no basis for issuance of an injunction.

C.   **The Balancing of Harms Weighs In Follett's Favor**

Given that Campus Stores has no likelihood of success and cannot establish irreparable harm, the balancing of harms clearly requires the denial of its motion. Issuing an injunction would not benefit Campus Stores in its contractual relationship with Curry. As President Quigley has stated, regardless of the results of this action, Curry does not intent to reverse the position it has taken since 2002. Quigley Aff., ¶ 18. The only effect an injunction will have is to interfere with Curry's ability to contract with the provider of its choice and to leave Curry in the position of having no service provider for its bookstore while summer classes are in session and for whatever length of time it takes for Curry to reach agreement with another provider. Surely, in this sense at least the interest of the public favors denial of Campus Stores' request for an injunction.

D.   **The Injunction Would Harm the Public Interest**

As previously noted, the party that will suffer the greatest harm should the present application for preliminary injunction be allowed is Curry, its students and faculty. Curry's president has unequivocally stated that under no circumstances will Curry continue its relationship with Campus Stores due to its inability and unwillingness to serve the needs of the college. If the injunction is allowed, Curry will be left without its bookstore to the substantial detriment of its students and faculty. In view of the foregoing, the public interest weighs heavily in favor of denial of the injunction.

## CONCLUSION

For all of the foregoing reasons, Follett respectfully requests that the present request for preliminary injunction be denied.

                    Respectfully submitted,

                    FOLLETT HIGHER EDUCATION GROUP, INC.

                    By its attorneys,

                    /s/ Mark Berthiaume
                    Mark A. Berthiaume, B.B.O. No. 041715
                    Seyfarth Shaw LLP
                    World Trade Center East
                    Two Seaport Lane, Suite 300
                    Boston, MA 02210-2028
                    Telephone:  (617) 946-4800

DATED:  May 31, 2005