UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CAMPUS STORES OF MASS., INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 05-11116 NG |
| FOLLETT HIGHER EDUCATION GROUP, INC., | ) ) ) ) | |
| Defendant. | ) ) | |

## AFFIDAVIT OF JOSEPH FLANAGAN

I, Joseph Flanagan, under oath hereby state as follows:

1. My name is Joseph Flanagan. I am currently employed by Follett Higher Education Group, Inc. ("Follett"), which operates bookstores at colleges, universities and other educational institutions.

2. I am submitting this affidavit in support of Follett's opposition to the request for preliminary injunction sought by Campus Stores of Mass., Inc. ("Campus Stores"). The information contained in this affidavit is based upon my personal knowledge and upon information and belief. To the extent that any portion of this affidavit is based upon information and belief, I believe it to be true.

3. I am currently employed by Follett as Vice President of Marketing for the Eastern Region, a position I have held since 1986. In this position, I am responsible for pursuing new business opportunities for Follett and working to preserve existing relationships with educational institutions.

4. In July 2004, Follett received a written letter from Kenneth Quigley, the President of Curry College in Milton, Massachusetts ("Curry"), inquiring as to Follett's interest in taking

BO1 15717998.1

over operation of Curry's bookstore. At no point prior to receipt of this communication had I or, to my knowledge, anyone else at Follett communicated or attempted to communicate with Curry regarding its bookstore.

5. On August 30, 2004, my immediate supervisor, William Dowdy, and I met with President Quigley in response to his letter. Aware of the confidentiality agreement that Follett had previously entered into with Curry's then-current bookstore operator, Campus Stores, I initially asked President Quigley about the status of Curry's agreement and future plans with Campus Stores. At that time, President Quigley informed us that Curry had terminated its agreement with Campus Stores and had no intention of entering into a new contract with them. He went on to state that Curry was not happy with Campus Stores' performance and that Campus Stores did not have the resources or willingness to adapt to the evolving needs of the school. In short, President Quigley made it clear that, whether or not Follett was interested in taking over Curry's bookstore operations, Campus Stores had no future at the school.

6. It also became evident at that August 30, 2004 meeting that Curry was particularly interested in seeking to have Follett operate its bookstore. President Quigley indicated that he had specifically reached out to Follett after he visited Fairfield University in Connecticut and came away impressed by the condition and operation of Follett's Fairfield store. President Quigley further informed us at the August 30 meeting that Curry was in the process of planning a new student center on campus, which would include a prominent new space for the bookstore. He also stated that, in light of these plans, Curry was interested in partnering with a company with Follett's reputation and resources.

7. The August 30, 2004 meeting ended with President Quigley indicating that he would be in touch as Curry's plans proceeded.

BO1 15717998.1

8. Neither I nor, upon information and belief, anyone else at Follett had any further communication with anyone at Curry until I was again contacted by President Quigley approximately six (6) months later in February 2005.

9. At that time, President Quigley informed me that Curry viewed Follett as its likely partner as it transitioned its bookstore into the eventual-new student center. At President Quigley's request, therefore, we arranged another meeting, at which I understood Curry's Director of Buildings & Grounds, Bob O'Connell, would be present to gain an understanding of Follett's needs for both the temporary bookstore space that was soon to be constructed and the eventual-new space in the forthcoming student center. I also understood that Dean Sue Pennini, who was in charge of Curry's strategic planning, would be present at the meeting.

10. The meeting subsequently took place on March 11, 2005. I attended along with Amanda Chase, one of Follett's Regional Managers, and Tim Walkup, our Vice President of Store Planning, who was present to answer Bob O'Connell's questions. Representing Curry at this meeting were President Quigley, Bob O'Connell, Dean Sue Pennini, and the school's Chief Financial Officer, Richard Sullivan.

11. At the outset of the meeting, I again asked President Quigley about the status of Campus Stores. He responded that Curry had terminated Campus Stores' contract long ago. President Quigley indicated that he had sent Campus Stores a termination letter a year or so earlier, and even went so far as to retrieve and refer to the letter during our meeting. While I did not have an opportunity to read the letter at the time, President Quigley made it clear that Curry did not intend to have a relationship with Campus Stores once the existing contract expired, which I was informed would take place on or about May 31, 2005.

12. Throughout the remainder of the meeting, it was clear from the discussion and the questions from the Curry representatives that they were very focused on securing Follett as the

school's new bookstore operator. At the end of the meeting, it was understood that Follett would prepare and submit a proposal for operation of the store.

13. On March 28, 2005, I submitted Follett's proposal to President Quigley and Curry.

14. A few days later, I learned that Tim Walkup had received a communication from Bob O'Connell of Curry, seeking specific information regarding Follett's electrical needs for the temporary bookstore space. This was somewhat unusual, given that we had not been informed that Follett's proposal had been accepted by Curry. Nonetheless, it only reinforced my belief that Curry was committed to securing Follett as the new operator for its bookstore. As a result, I advised Tim Walkup to provide the requested information.

15. Subsequently, on May 9, 2005, President Quigley contacted me and indicated that Curry wanted to move forward with Follett. While there remained issues to be resolved and we still did not have a contract with Curry, it was clear to me that we were moving in the right direction.

16. The following day, I was informed that Campus Stores had sent Follett a cease-and-desist letter concerning Curry.

17. At no time did I or anyone else at Follett, to my knowledge, use any information, confidential or otherwise, that Follett had received from Campus Stores during our buy-out talks back in 2003, in the course of our discussions with Curry. Indeed, I do not believe that I have any such information in my possession. Still further, there would have been no reason or

opportunity to use such information, given that Curry made it clear from our very first meeting with them in August 2004 that we would not be bidding against Campus Stores for the bookstore contract.

Signed under the pains and penalties of perjury this 30th day of May, 2005.

/s/ Joseph Flanagan<br>
Joseph Flanagan