UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CAMPUS STORES OF MASS., INC.,

                    Plaintiff,

v.

FOLLETT HIGHER EDUCATION GROUP,
INC.

                    Defendant.

**C.A. No. 05 CV 11116 NG**

## PLAINTIFF'S AMENDED MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Campus Stores of Mass., Inc. ("Campus Stores") hereby submits this Amended Memorandum of Law in Support of Its Motion for Preliminary Injunction.

### INTRODUCTION

In connection with the potential purchase of Plaintiff's college bookstore business, Defendant Follett Higher Education Group, Inc. ("Follett") signed a Confidentiality and Nondisclosure Agreement (the "Agreement") in which it agreed:

- It would be receiving from Plaintiff Campus Stores of Mass., Inc. ("Campus Stores") Confidential Information such as customer lists, customer contract information including expiration dates, sales data, profitability analysis, marketing plans and staffing models ("Confidential Information").

- It would keep this information strictly confidential and would not use it "for any competitive purposes."

- It would not "contact, solicit or accept business from" Campus Stores' customers.

- That injunctive relief was appropriate to prevent any "breach or threatened breach of any provisions of this Agreement."

Follett has breached the Agreement by contacting, soliciting and now accepting the business of Curry College, one of Campus Stores' customers. Campus Stores demanded that Follett cease and desist its efforts to procure the Curry College contract, but Follett failed to do so. Given Follett's calculated efforts to raid Campus Stores' customer base and its conscious disregard of its clear contractual obligations, Campus Stores is forced to come to this Court to obtain an injunction preventing Follett from contacting, soliciting or accepting business from Campus Stores' customers.

By seeking to enforce the Agreement, Campus Stores does not seek protection from ordinary competition. It seeks protection from unfair competition. The parties understood that, by giving Follett access to Plaintiff's Confidential Information, there was a significant risk that Follett would use that information to its unfair competitive advantage in future bid scenarios with Campus Stores' customers. That risk of unfair competition was so great that the Agreement itself provided that Follett's mere contact with one of Plaintiff's customers would constitute a breach and would trigger injunctive relief, without any requirement to show or prove that Follett misused the Confidential Information in the process. The Agreement's primary benefit to Campus Stores, therefore, was the elimination of that risk. By contacting and accepting business from Curry College, however, Follett has stripped that benefit away from Campus Stores. Injunctive relief is required, therefore, in order to protect Campus Stores from the current breach of contract and from any further flagrant violations of the Agreement by Follett.

## FACTS

**A.     Campus Stores and Follett Enter Into Discussions Regarding Follett's Potential Acquisition of Campus Stores' Business.**

Campus Stores is a local company which operates bookstores on nine college campuses in Massachusetts and New Hampshire. (See Amended Verified Complaint at ¶ 3.) Follett, on the other hand, is the largest operator of campus bookstores in the world, with stores on more than 700 campuses across the nation. (Am. Ver. Cmplnt. at ¶ 4.)

In or about 2003, Campus Stores attempted to sell its business. (Am. Ver. Cmplnt. at ¶ 5.) As part of an organized sales process, Campus Stores required prospective purchasers to sign a Confidentiality Agreement before they were given access to certain confidential information concerning Campus Stores' business ("Confidential Information"). (Am. Ver. Cmplnt. at ¶ 5.) The Confidential Information included, but was not limited to, information regarding the identity of the host colleges with which Campus Stores had contracts, the financial terms of each relationship, the commission structure, staffing models, profit margins and the dates that each contract was to expire. (Am. Ver. Cmplnt. at ¶ 5.) Campus Stores was concerned that a prospective purchaser unfairly could use such information to its competitive advantage in future bidding contests. (Am. Ver. Cmplnt. at ¶ 6.) For example, a competitor could structure its bid so as to exceed the financial benefits that it knew the college had been receiving from Campus Stores. (Am. Ver. Cmplnt. at ¶ 6.) In order to eliminate this risk and to protect its existing and future relationships, Campus Stores required all prospective purchasers to sign a Confidentiality Agreement in consideration for access to its Confidential Information. (Am. Ver. Cmplnt. at ¶ 6.)

**B.      Follett Enters Into Confidentiality Agreement.**

On or about July 23, 2003, Defendant Follett entered into a Confidentiality and

Nondisclosure Agreement (the "Agreement") with Campus Stores, a copy of which is attached

hereto as <u>Exhibit A</u>.  (Am. Ver. Cmplnt. at ¶ 7.)  The Agreement contains the following key

provisions:

> 3.      The parties agree that any Confidential Information received or acquired by one party (the "Receiving Party") from the other party (the "Disclosing Party") hereunder, shall be held in trust and confidence for the Disclosing Party and Receiving Party shall not, without the prior written consent of the Disclosing Party, disclose such Information to anyone, nor use such Information for any purpose except in connection with the activities contemplated by this Agreement.

> 10.     […]  Furthermore, the Receiving Party shall not use any Confidential Information of the Disclosing Party for any competitive purposes.  **Follett-HEG agrees not to contact, solicit or accept business from, either directly or indirectly, Campus Stores' suppliers, customers or host colleges through the close of the next round of contract bidding for each such supplier, customer or host college.**  The restriction in the immediately preceding sentence shall be applicable only with respect to the first time each of such contracts come up for bid or renewal following the date of this Agreement.

> 11.     In the event of any breach or threatened breach of any provision of this Agreement, the Disclosing Party shall be entitled to immediate temporary, preliminary and/or permanent injunctive relief to prevent any such breach or threatened breach, in addition to any other relief available at law or at equity.

> 12.     The Receiving Party indemnifies and agrees to hold the Disclosing Party harmless from and against any and all losses, damages, liabilities, costs and expenses, including attorneys' fees, incurred by the Disclosing Party, arising out of or relating to the breach by the Receiving Party of any of the agreements contained herein.

(Emphasis added).  (Am. Ver. Cmplnt. at ¶ 7.)  Based upon Follett's covenants as set forth in the

Agreement, Campus Stores provided Follett with a 41 page Confidential Offering Memorandum

setting forth extensive confidential information including financial data for each of Plaintiff's

accounts, profit margins, staffing models, commission structures, operating expenses, and the dates each contract was to expire.  (Am. Ver. Cmplnt. at ¶ 8.)

**C.     Follett Contacts Campus Stores for Permission to Pursue Nichols College.**

In 2004, Campus Stores' contract with Nichols College expired.  (Am. Ver. Cmplnt. at ¶ 9.)  At or about that time, a representative from Follett sought permission to bid on the Nichols College account.  (Am. Ver. Cmplnt. at ¶ 9.)  Campus Stores declined to grant Follett this permission, and invoked the provisions of the Agreement as set forth above.  (Am. Ver. Cmplnt. at ¶ 9.)  Follett acknowledged the enforceability of the Agreement, and indicated that it would abide by its covenants not to solicit or accept business from Campus Stores' host colleges.  (Am. Ver. Cmplnt. at ¶ 9.)  Upon information and belief, Follett ceased its pursuit of the Nichols College account.  (Am. Ver. Cmplnt. at ¶ 9.)

**D.     Follett Breaches the Agreement by Negotiating with Curry College.**

For approximately 26 years, since July 1, 1979, Campus Stores has had a contract with Curry College and has enjoyed an overall favorable relationship with the school.  (Am. Ver. Cmplnt. at ¶ 10.)  Campus Stores' contract with Curry College was set to expire on May 31, 2005, and would thereafter come up for bid or renewal, a fact made known to Follett vis-à-vis the confidential disclosure detailed above.  (Am. Ver. Cmplnt. at ¶ 10.)  Until very recently, Curry College had never indicated that it did not intend to renew Campus Stores' contract.  (Am. Ver. Cmplnt. at ¶ 10.)  In fact, as recently as February 2005, Curry College sent Campus Stores a letter in which the college made clear that Campus Stores was part of its future plans beyond May 2005.  (Am. Ver. Cmplnt. at ¶ 10.)

In or about early May 2005, Campus Stores learned that Follett was in the process of soliciting or negotiating an agreement with Curry College, in direct violation of its covenants to

Campus Stores pursuant to the Confidentiality Agreement. (Am. Ver. Cmplnt. at ¶ 11.) By letter dated May 5, 2005, counsel for Campus Stores wrote to Thomas Christopher, the president of Follett, to demand that Follett immediately cease and desist from further negotiations with Curry College. (Am. Ver. Cmplnt. at ¶ 11.) Follett did not send a written response to that letter. (Am. Ver. Cmplnt. at ¶ 11.)

In sharp contrast to Curry College's prior encouragement to submit a bid to renew the contract, Campus Stores received a letter dated May 18, 2005 from Curry College indicating for the first time that it was apparently dissatisfied with Campus Stores and that it intended to pursue a relationship with a "large national bookstore chain" instead of continuing on with Plaintiff. (Am. Ver. Cmplnt. at ¶ 12.) Upon information and belief, Curry College's decision to send this letter at this time was precipitated and improperly influenced by Follett, and demonstrates Follett's unfair competition and misuse of Campus Store's Confidential Information. (Am. Ver. Cmplnt. at ¶ 13.) In fact, Follett had been in contact with Curry College since approximately August 2004 and had submitted a proposal to Curry College on or about March 28, 2005 to become Curry's new bookstore operator. (Am. Ver. Cmplnt. at ¶ 14.)

Upon information and belief, Follett has accepted business from Curry College and is now the college's bookstore operator. (Am. Ver. Cmplnt. at ¶ 15.)

**STANDARD OF REVIEW**

When deciding whether to grant injunctive relief, trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102

F.3d 12, 15 (1996). Legitimate business interests include protection of trade secrets, confidential information, and good will. *Id.* at 20.

Courts look "less critically" at restrictive covenants arising from the sale of a business because, unlike employers and employees, buyers and sellers are likely to be similarly-situated, with equal bargaining power and often times the benefit of counsel. *Boulanger v. Dunkin' Donuts Inc.*, 442 Mass 635, 640 (2004) (more liberal enforcement of noncompetition agreement in context of sale of a business); *Wells v. Wells*, 9 Mass.App.Ct. 321, 321-25 (1980) (citing *Alston Studios, Inc. v. Lloyd V. Gress & Assoc.*, 492 F.2d 279, 284 (4th Cir. 1974) (concerns arising from unequal bargaining power between an employer and an employee recedes when the restriction arises in the context of the sale of a business. Courts consider whether "the parties entered into the agreement with the assistance of counsel and without compulsion.")

## ARGUMENT

Campus Stores is entitled to preliminary injunctive relief to enforce the restrictive covenants in the Agreement because it can demonstrate: (1) a likelihood of success on the merits of its claim that Follett breached the Agreement; (2) a substantial risk that Campus Stores will suffer irreparable harm in the absence of the requested injunction; and (3) that the gravity of the risk of harm to Campus Stores, considered in the light of its chances of success, outweighs the risk of harm to Follett. Moreover, enforcement of the Agreement through an injunction is necessary in order to protect Plaintiff's legitimate business interests – specifically its Confidential Information and its goodwill.

I.    **CAMPUS STORES IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST FOLLETT.**

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir.1996). The greater the likelihood of success on the merits, the less risk of irreparable harm to the plaintiff must be shown. *Id.* at 19. In this case, Campus Stores is likely to succeed on its claims arising from Follett's breach of the Agreement.

A.    **Follett Knowingly and Intentionally Breached the Agreement**

Campus Stores anticipated the serious risks that could result from providing competitors with access to its Confidential Information and thus it took steps to avoid such risks by requiring interested parties such as Follett to enter into the Confidentiality Agreement. By its express, unambiguous terms, the Agreement provides that (1) Plaintiff's customers and contract information constitute Confidential Information; and (2) that the Receiving Party would not "contact, solicit or accept" business from Plaintiff's customers for a defined period.[1] These covenants were unconditional and were not dependent upon Campus Stores' likelihood of retaining the customers' business.

Follett does not dispute that it made contact with Curry College, that it submitted a proposal to Curry to become the college's campus bookstore operator, and that Curry accepted Follett's proposal and awarded it the contract. (*See generally* Affidavits of Kenneth K. Quigley, Jr. and Joseph Flanagan.) These actions, separately and cumulatively, constitute a breach of the Agreement. Follett's promise not to engage in this exact conduct constituted the consideration relied upon by Campus Stores when it entered into the Agreement and when it provided Follett

---

[1] By stipulating that these restrictions would apply only to Campus Stores existing contracts, and would remain in place only with respect to the first time each of those contracts came up for bid or renewal, the parties narrowly tailored the agreement so as to avoid any unreasonable restraint on trade.

with its Confidential Information.  As such, Campus Stores has demonstrated a reasonable likelihood of succeeding on the merits of its breach of contract claim against Campus Stores.

Unlike last year when the Nichols College contract came up for renewal, Follett elected not to seek Campus Stores' permission to contact or accept business from Curry College, knowing that Campus Stores would likely object.  There can be no real question here that Follett knew of its contractual obligations to Campus Stores and blatantly and deliberately breached such known obligations through its contact and ultimate acceptance of Curry College's business. By failing to disclose such contact and related efforts, even after Campus Stores demanded its adherence to the Agreement, Follett's conduct not only constitutes a breach of the Agreement and of the implied covenant of good faith and fair dealing, it also violates G.L. Chapter 93A.  *See Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47 (1st Cir. 1998) ("where one party to an agreement employs a breach of contract to gain an unfair advantage over the other, the breach 'has an extortionate quality that gives it the rancid flavor of unfairness'").

**B.    Plaintiff's Likelihood of Retaining the Curry College Account is Irrelevant to Whether Follett Breached the Agreement**

In its opposition, Follett attempts to persuade this court into believing that the Agreement only applies where Campus Stores has a likelihood of retaining a school's business.  Follett's attempt to shift the focus of inquiry onto whether Campus Stores had a likelihood of retaining the Curry College contract is irrelevant, however, as to whether Follett breached the Agreement, which has no provision, express or implied, regarding Campus Stores' likelihood of retaining the account.  In fact, Campus Stores never intended the Agreement to be a guarantee that it would keep the Curry College account.  Rather, the Agreement eliminated the possibility that Follett would have the opportunity to misuse Campus Stores' Confidential Information to obtain Plaintiff's accounts and sought to protect Campus Stores from having to prove that it had a

likelihood of retaining Curry, or that Follett misused confidential information, or that such misuse was the proximate cause of Curry's decision to discontinue its relationship with Campus Stores. Such evidence is difficult, if not impossible, to find where two parties collude to breach a contract, as Follett and Curry have done here.

In exchange for its promise not to contact, solicit or accept business from Campus Stores' customers, Follett was granted access to Campus Stores' Confidential Information in order to make an informed assessment of the value of the business. Relying on these promises, Campus Stores gave Follett access to its Confidential Information. By submitting a proposal to Curry and ultimately accepting the account, Follett effectively denied Campus Stores the benefit of its bargain and has exposed the possibility that Follett misused the Confidential Information. This is the exact type of predatory conduct which prompted Campus Stores to require potential purchasers to sign the Confidentiality Agreement and the exact type of harm which Campus Stores sought to avoid.

Follett's conduct with respect to the Nichols College account underscores that it was well aware of the extent and nature of the restrictions in the Agreement. Only a year ago, Follett sought Campus Stores' permission to contact and solicit the Nichols College account. Campus Stores refused to permit Follett to have such contact. At that time, Follett expressly acknowledged the existence and enforceability of the restrictions imposed by the Agreement. Further, given that Campus Stores refused to permit Follett from pursuing that account, Follett was put on notice that Campus Stores intended to enforce the protections afforded by the Agreement. Ultimately, Nichols did not renew Campus Stores' contract, and instead elected to contract with a different vendor. Campus Stores' likelihood of retaining the Nichols College

account played no part whatsoever in the analysis of whether Nichols was off limits under the Agreement.

Likewise, Campus Stores' likelihood of retaining the Curry College account had no effect on the terms or enforceability of the Agreement. As such, Campus Stores has shown a substantial likelihood of success on the merits of its claims necessary to support issuance of the requested injunction.

## II.  CAMPUS STORES WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT ISSUE THE REQUESTED INJUNCTIVE RELIEF.

To soften the severity of its breach, Follett would like this Court to believe that Campus Stores suffered no damages since it would have lost the Curry College account in any event. As an initial matter, Campus Stores challenges Follett's conclusion that its loss of the Curry College account was a foregone conclusion. The statements and actions of Curry College from September 2002 through May 2005, as detailed in the Affidavit of Eric Cressman, belie such a conclusion. Ultimately, however, Curry's decision to terminate Campus Stores does not change the clear and unambiguous terms of the Agreement, nor the extent of irreparable harm that Follett's breach has caused, and will continue to cause, if an injunction does not issue.

District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief. *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989). To establish irreparable harm, a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business. *Ross-Simons*, 102 F.3d at 18-19, *citing General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 591 (7th Cir.1984). If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel. *Id.* (citations omitted); *K-Mart*, 875 F.2d at 915; *Ocean Spray Cranberries, Inc. v. PepsiCo., Inc.*,

160 F.3d 58, 61 (1st Cir. 1998) (court held that injunctive relief requiring specific performance of a contract may be granted where monetary damages are uncertain and difficult to assess, where the harm caused by a breach of contract, although economic in nature, is impossible to assess or significantly difficult to measure accurately). Thus, "a cognizable threat of such harm can support a restraining order." *Ross-Simons,* 102 F.3d at 19 (threatened loss of goodwill held to constitute irreparable harm for purposes of injunctive relief).

Moreover, courts do not gauge irreparable harm in a vacuum; but instead make an evaluation relative to the movant's degree of likelihood of success on the merits. *Ross-Simons,* 102 F.3d at 19 (the greater the likelihood of merits success, the less that is required in the way of irreparable harm); *see also Gately v. Commonwealth of Mass.,* 2 F.3d 1221, 1232 (1st Cir.1993) (noting the same phenomenon and suggesting that irreparable harm is subject to a "sliding scale" analysis), *cert. denied*, 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994).

In the present case, in the absence of an injunction, Campus Stores will suffer irreparable harm because it may well lose all of its business to Follett's predatory tactics. As stated above, Campus Stores only has contracts relating to nine stores. Each contract is therefore vital to its continued existence. An injunction is critical to preserving Campus Stores' remaining goodwill and business and to prevent Follett from benefiting from the fruits of its knowing and intentional contractual violations. Here, the parties recognized the importance of the information and agreed that injunctive relief was the appropriate remedy to protect that information. Where two commercially sophisticated parties knowingly agree to the entry of injunctive relief to protect confidential information, the Court should hold them to their agreement and enter an injunction.

This Court has found irreparable harm in similar cases to this. For example, in *K-Mart Corp. v. Oriental Plaza, Inc.*, the First Circuit upheld a finding of irreparable harm supporting a

preliminary injunction prohibiting a landlord from constructing new space in front of a K-Mart store. The court found that the losses of revenues were "sufficiently problematic as to defy precise dollar quantification." *Id.* at 915. Likewise, in *Ross-Simons*, the First Circuit upheld an injunction against a supplier of crystal who refused to continue its supply agreement to a retailer on the ground that its breach would not only undermine the business, but would damage the retailer's goodwill and reputation with third party customers, which injuries were not easily measured or fully compensable in damages. 102 F.3d at 20. The court, however, determined that business failure is not required to establish irreparable harm. Id. at 18.

In this case, like *Ross-Simons* and *K-Mart*, it is difficult to assess or quantify Campus Stores' damages stemming from Follett's breach of the Agreement. In fact, the parties here anticipated that it would be sufficiently difficult to assess such damages, which is why they expressly stipulated in the Agreement that any breach or threatened breach would trigger injunctive relief. Likewise, the parties anticipated that it would be difficult to prove Follett's use of Plaintiff's Confidential Information, which is why they expressly agreed that mere contact, solicitation or acceptance of business would constitute a breach and would trigger injunctive relief. In effect, under the Agreement, Follett's use of the information was presumed where it had contact with or accepted business from one of Campus Stores' customers. Any other interpretation of the Agreement would render these prohibitions meaningless. *See Shea v. Bay State Gas Co.,* 383 Mass. 218 (1981) (under Massachusetts law contracts are interpreted to further the expressed intention of the parties and should not be interpreted to render any provision meaningless).

Follett's reliance on the *Ocean-Spray* decision is misplaced. In *Ocean Spray*, the court readily distinguished itself from cases like *K-Mart, Ross-Simons* and the present case, where the

breach of the respective agreements would have an immediate adverse effect on the plaintiffs'

businesses (K-Mart's visibility and parking capacity; Ross-Simon's customer goodwill and

catalog business). Conversely, in *Ocean Spray*, the court was not convinced that Pepsi's

acquisition of Tropicana (and breach of the exclusivity agreement) would necessarily negatively

impact Ocean Spray sales. Moreover, the contract in the *Ocean Spray* case did not presuppose

the issuance of an injunction in case of breach as the contract in the present case does. (See ¶11

of the Agreement).

     The present case is similar to *K-mart* and *Ross-Simons* as the potential for negative

consequential harm would be immediate if Follett is permitted to continue to disregard its

obligations not to contact or accept business from Plaintiff's customers. Again, the parties

recognized that any contact or participation by Follett would likely involve the use or disclosure

of Campus Stores' Confidential Information. Protecting against such use was a key reason why

Campus Stores insisted on Follett's execution of the Agreement. If Follett is permitted to

continue to disregard its contractual obligations in this manner, it makes all of Campus Stores'

remaining contracts vulnerable to attack by Follett. Given the calculated manner in which

Follett has acted with respect to Curry College, there is little doubt that, absent a court order, it

would act differently with respect to Plaintiff's remaining customers. Therefore, Plaintiff will

suffer irreparable harm without the protection of an injunction.

**III.    THE RISK OF IRREPARABLE HARM TO CAMPUS STORES ABSENT THE
REQUESTED INJUNCTION FAR OUTWEIGHS THE MINIMAL
RESTRICTIONS THE INJUNCTION WOULD IMPOSE ON FOLLETT.**

     As described above, Campus Stores has established that it is reasonably likely to succeed

on the merits of its claims against Follett. Moreover, Campus Stores has suffered and will

continue to suffer irreparable harm absent injunctive relief. Denial of injunctive relief under

these circumstances essentially would render the Agreement meaningless and would give Follett

- 14 -

license to ignore its promises and raid Plaintiff of its remaining customers. In each instance, Follett could merely produce an affidavit stating that it did not use the Confidential Information, as it did here. In such instances, the goodwill and hard-earned reputation for which Campus Stores has worked tirelessly to build would be immediately extinguished, and the jobs of approximately 25 employees would be lost.

By contrast, an injunction would have minimal, if any, impact on Follett's multi-billion dollar business. Even if an injunction issues, Follett still would be free to pursue any of the hundreds of thousands of other colleges and universities nationwide. It only would be prevented from soliciting or doing business with these few colleges, and then, only until the first time each of Plaintiff's contracts come up for bid or renewal following the date of the Agreement. As such, the injunction would not prevent Follett from competing in the marketplace, as Follett would remain perfectly free, even in the same geographic area, to pursue any accounts other than the few at issue here.

Moreover, to suggest that an injunction here would somehow work an injustice on Curry College, its students and the faculty is hardly a persuasive factor given the circumstances which necessitated the injunction. As an initial matter, text-books, school sweatshirts, and the like are retail commodities which can be purchased at alternate locations by students and faculty. It is an gross overstatement to suggest that an injunction would work a great injustice on students who would have to buy their books and Curry College embroidered t-shirts elsewhere or wait a short time before they were again available on campus. More importantly, however, is that Follett's own reckless conduct and contractual breaches led to the predicament that Curry College would face should an injunction issue. Follett should not be permitted to use the consequences of its own conduct as a way to avoid the issuance of an injunction. Follett should have foreseen this

- 15 -

potential consequence and could have prevented it by informing Campus Stores of its intentions

with respect to Curry long ago, or by informing Curry College of the restrictions in its

Agreement with Campus Stores.  Given Follett's pattern of deceptive conduct, its concern for

Curry College students is self-serving and disingenuous.

Finally, issuance of the requested injunction would serve the public interest.  Non-

competition agreements are common in the business world when businesses discuss mergers and

acquisitions.  Denial of the requested relief in this case would through uncertainty into those

discussions.  Even worse, it could send a signal that larger, more dominant companies can

willfully ignore these types of agreements and prey upon their smaller competitors.  Certainly,

the public interest would not be served under those circumstances.

## CONCLUSION

For the reasons stated above, Campus Stores respectfully requests that the Court grant its

Motion for Preliminary Injunction and enter in the Order in the form attached thereto as

Exhibit A.

Respectfully Submitted,

CAMPUS STORES OF MASS., INC.

By its attorneys,

/s/ Bradley L. Croft
Christopher P. Litterio, BBO #551098
Bradley L. Croft, BBO #633347
RUBERTO, ISRAEL & WEINER, P.C.
100 North Washington Street
Boston, MA  02114
(617) 742-4200

Dated: June 23, 2005