UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAMPUS STORES OF MASSACHUSETTS, INC., | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     C.A. No. 05-11116-NG |
| | ) |
| FOLLETT HIGHER EDUCATION GROUP, INC., | ) |
| Defendant. | ) |

GERTNER, D.J.:

**MEMORANDUM AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTIVE RELIEF**
**August 2, 2005**

I.  **INTRODUCTION**

This is a contract dispute arising out of an alleged breach of a confidentiality and non-disclosure agreement signed by two campus bookstore retailers, one with hundreds of operations globally and the other with a handful of operations locally.  Now before the Court is plaintiff's motion for a preliminary injunction to enforce the restrictive covenants contained in the agreement, which was signed by the parties in connection with defendant's potential acquisition of plaintiff's business in 2003.  At this time, plaintiff seeks to enjoin defendant from taking over its contract with its longtime customer, Curry College.

The Court heard plaintiff's motion for a preliminary injunction on June 24, 2005.  At the conclusion of that hearing, the Court made a finding on the record that plaintiff is likely

to succeed on the merits of its breach of contract claim.  The
Court then reserved decision on the issue of irreparable harm.

As discussed below, the strength of plaintiff's breach of
contract claim, coupled with serious doubts as to the adequacy of
monetary relief, warrants preliminary injunctive relief.  Thus,
plaintiff's motion for a preliminary injunction [document #15] is
hereby **GRANTED** as follows: defendant is hereby **ENJOINED** from
commencing its impending contract with Curry College and from
contracting with Curry College through the close of the next
round of contract bidding, as the parties' contract promises.

## II.  BACKGROUND

Plaintiff Campus Stores of Massachusetts, Inc. ("Campus
Stores") operates bookstores on ten college campuses in
Massachusetts and New Hampshire, including Curry College in
Milton, Massachusetts ("Curry").  Defendant Follett Higher
Education Group ("Follett") is one of the largest operators of
campus bookstores in the world, with stores on more than 700
campuses in the United States alone.

### A.  Campus Stores' Potential Acquisition by Follett

In 2003, Campus Stores tried to sell its business.  Pursuant
to an organized selling process, Campus Stores required
prospective purchasers to sign a confidentiality agreement before
they were given access to confidential information about their
business, including the identity of the host colleges with which

Campus Stores did business, and the financial terms of those relationships.  Campus Stores required an agreement of confidentiality in order to eliminate the risk that prospective purchasers would use the information provided to its competitive advantage in future bidding contests.

On July 23, 2003, defendant Follett – the Goliath of campus bookstore operators – entered into such an agreement with Campus Stores.  The Confidentiality and Non-disclosure Agreement (the "Agreement") contains the following relevant provisions:

3. The parties agree that any Confidential Information received or acquired by one party (the "Receiving Party") from the other party (the "Disclosing Party") hereunder, shall be held in trust and confidence for the Disclosing Party and Receiving Party shall not, without the prior written consent of the Disclosing Party, disclose such Information to anyone, nor use such Information for any purpose except in connection with the activities contemplated by this Agreement.

10. [. . .] Furthermore, the Receiving Party shall not use any Confidential Information of the Disclosing Party for any competitive purposes.  **Follett-HEG agrees not to contact, solicit or accept business from, either directly or indirectly, Campus Stores' suppliers, customers or host colleges through the close of the next round of contract bidding for each such supplier, customer or host college.**  The restriction in the immediately preceding sentence shall be applicable only with respect to the first time each of such contracts come up for bid or renewal following the date of this Agreement.

11. In the event of any breach or threatened breach of any provision of this Agreement, the Disclosing Party shall be entitled to immediate temporary, preliminary and/or permanent injunctive relief to

prevent any such breach or threatened breach, in
addition to any other relief available at law or
at equity.

12. The Receiving Party indemnified and agrees to hold
the Disclosing Party harmless from and against any
and all losses, damages, liabilities, costs and
expenses, including attorneys' fees, incurred by
the Disclosing Party, arising out of or relating
to the breach by the Receiving Party of any of the
agreements contained herein.

Amended Verified Complaint and Jury Demand, p. 3, filed June 15,

2005 (emphasis added).

After the parties signed the Agreement, Campus Stores

provided Follett with a 41-page Confidential Offering Memorandum

setting forth extensive confidential information including

financial data for each of Campus Stores' accounts, profit

margins, staffing models, commission structures, operating

expenses, and the dates each contract was set to expire.

The negotiations were unsuccessful.  Campus Stores did not

sell its business to Follett, or to any other company.

**B.   Campus Stores' Contract With Curry College**

Campus Stores has operated Curry's campus bookstore since

1979.  Campus Stores' most recent contract with Curry was set to

expire on May 31, 2005, and would thereafter come up for bidding

or renewal.  Follett was aware of the contract's expiration date

vis-a-vis Campus Stores' confidential disclosure in 2003.  The

circumstances surrounding the expiration of Campus Stores'

contract with Curry are the subject of the instant action:

-4-

On September 17, 2002, Eric Cressman, President of Campus
Stores, received a letter from Richard Sullivan, Chief Financial
Officer for Curry, advising him that the current contract between
Campus Stores and Curry was outdated and in need of "updating."
To that end, Sullivan wrote that "the College believes it is good
business for both [Curry] and Campus Stores to enter into a new
agreement with updated terms mutually agreeable to both parties."
The letter went on to state that it should serve as a formal
written notification of Curry's intention to terminate its
existing agreement with Campus stores effective on May 31, 2003.
Finally, Sullivan, on behalf of Curry, invited Campus Stores "to
propose a new agreement to the College, to begin June 1, 2003,"
and asked Campus Stores to "please forward [its] proposal to
[his] attention as soon as possible."

On September 25, 2002, Cressman, on behalf of Campus Stores,
sent a letter to Curry agreeing that it would be desirable to
update certain parts of their existing contract, which was
entered into in 1989, and he promised to send a draft updated
contract within two weeks.  Cressman's letter also notes that the
current contract was valid through May 31, 2005, not May 31,
2003, as was incorrectly stated in Curry's September 17 letter.
He closed the letter by accepting Curry's "invitation to propose
a new agreement . . . to be mutually agreeable to both parties

and to commence on June 1, 2003," as requested by Curry in the September 17 letter.

As promised, on October 9, 2002, Campus Stores provided Curry with a draft proposal for an updated contract, including updated language, increased commission, and a donation schedule.

It was not until May 18, 2005 – two and one half years after Campus Stores submitted its proposed updated contract and only two weeks before the current contract was set to expire – that Curry formally rejected Campus Stores' proposal and informed them that they would not be renewing their contract.  In the May 18 letter, Curry wrote that it had made a decision over two and one half years before that "the College ha[d] no intention to continue its relationship with Campus Stores beyond May 31, 2005," their existing contract's date of expiration.

But the actual relationship between Curry and Campus Stores in the intervening two and on half years suggested otherwise. Indeed, aside from never formally rejecting Campus Stores' proposal, Curry signaled its intention to continue to do business with Campus Stores beyond May 2005.  After submitting its proposal in October 2002, Cressman met with Curry officials, including Richard Sullivan, Chief Financial Officer, and Kenneth Quigley, Curry's President, in December 2002 and February 2003 to review their existing contract and discuss Campus Stores' proposal for a renewed contract.

Again, in February 2004, Cressman discussed the status of the proposed contract with Sullivan, this time on the eve of the launch of Curry's capital campaign.  During the meeting, Sullivan and Cressman discussed, albeit vaguely, Campus Stores' potential contribution to that effort.  Despite promising to get back to him promptly, Sullivan never followed-up with Cressman.  Later that month, Cressman left three voice messages for Sullivan, and finally sent him a follow-up letter reminding him of the lingering proposal.  Sullivan did not return any of Cressman's communications.

On February 24, 2004, Campus Stores received a letter from President Quigley asking them to donate $5,125 to sponsor a golf tournament to benefit Curry.  While Campus Stores had historically donated to this event, Curry had never requested such a large donation.  Believing that their proposal was still in play, Campus Stores agreed to donate $5,125, the amount solicited.

In September 2004, Curry informed Campus Stores that they would be doing a Request for Proposal ("RFP") in connection with Curry's future bookstore operations.  During the phone conversation, Sullivan told Cressman that Campus Stores was on the short list of RFP participants and that Curry was undertaking the RFP process with all of their contracts to fulfill its professional responsibility and due diligence requirements as a

non-profit.  Sullivan assured Cressman that Curry had no complaints about Campus Stores' operation.  He added that Campus Stores' 25 years of service to Curry evidenced a valuable track record, and that they were a key vendor.

In February 2005, Campus Stores received a fax from President Quigley informing them of Curry's plans for the construction of a new residence hall and the renovation of their student center.  The letter explained how the bookstore would be affected by the upcoming construction.  Nothing in the letter indicated that Campus Stores would be ceasing its operations at Curry in a mere three months.  To the contrary, the letter concludes by informing Cressman that he would "be hearing from Bob O'Connell (head of building and grounds) and/or Sue Pennini (Dean of Strategic Planning) in connection with this move and the upcoming Cambridge College preparations."  In response, on February 18, 2005, Campus Stores sent a letter to President Quigley thanking him for the update and stating that "[Campus Stores] look[s] forward to working with Bob and Sue to coordinate the move and to make preparations for the upcoming Cambridge College session," which was not scheduled to begin until after May 31, 2005, the date of expiration of the existing contract.

On April 26, 2005, in a further attempt to formalize the terms of the renewed contract, Campus Stores hand-delivered a revamped proposal to President Quigley.

On May 10, 2005, Curry's development director, Thomas Brodnicki, invited Campus Stores to Curry's annual President's Circle Donor Dinner for those who had donated more than $10,000 in the previous year.  During Cressman's conversation with Brodnicki, Brodnicki told him that President Quigley had shared Campus Stores' April 26 generous proposal with him.

On May 14, 2005, Cressman and his wife attended the donor dinner, during which Campus Stores was publicly recognized by President Quigley for their longtime generosity.

Four days later, on May 18, 2005, President Quigley faxed a letter to Campus Stores informing them for the first time that Curry would not be renewing its contract with them.  Instead, the letter explained, Curry would be contracting with a large national campus bookstore chain.  That chain turned out to be Follett.  Campus Stores' contract expired twelve days later, on May 31, 2005.

C.  **Curry's Negotiations with Follett**

As it turns out, in July 2004, in the midst of its RFP process, Curry solicited proposals from Follett and Barnes and Noble, both large national campus bookstore chains.  By letter dated July 7, 2004, President Quigley first contacted Follett to

discuss the possibility of their taking over Campus Stores'
operations at Curry.

In subsequent undocumented conversations with Follett
representatives in August 2004, President Quigley allegedly
advised them that Curry's contract with Campus Stores would
terminate on May 31, 2005, and that Curry had no intention of
continuing its relationship with Campus Stores beyond that date.
President Quigley claims that he told Follett that Curry was
generally unhappy with Campus Stores' performance, although no
specific complaints are cited in President Quigley's affidavit.
Nor is there any record of Curry communicating grievances of any
kind to Campus Stores, although President Quigley claims that he
told Follett "Campus Stores lacked the resources [and]
willingness to adapt to the evolving needs of the school."
President Quigley allegedly told Follett that Campus Stores had
no future at the school, whether or not Follett was interested in
taking over Curry's campus bookstore.

On March 11, 2005, Follett officials and Curry officials met
to discuss Curry's needs, as well as the upcoming campus
construction and renovations.  At the outset of the meeting,
President Quigley told Follett that Curry "had terminated Campus
Stores' contract long ago," and presented Follett with a copy of
the September 2002 letter.  Two weeks later, on March 28, 2005,
Follett submitted its proposal for operating Curry's bookstore.

On May 9, 2005, Curry informed Follett that it intended to accept Follett's proposal and that any unresolved issues would be settled in the near future, whereupon a contract would be formalized.  Nine days later, on May 18, 2005, Curry informed Campus Stores for the first time of its intention to terminate their relationship and contract with Follett.

### D.    Campus Stores Files Suit Against Follett

By letter dated May 5, 2005, upon learning that Follett was in the process of negotiating an agreement with Curry, Campus Stores wrote to Follett to demand that Follett immediately cease and desist from further negotiations with Curry.  Follett did not respond.

On May 18, 2005, Curry informed Campus Stores that it would not be renewing their contract.  On May 26, 2005, Campus Stores filed suit against Follett in Suffolk County Superior Court.  The following day, Follett removed the case to the District of Massachusetts pursuant to 28 U.S.C. §§ 1441 and 1446.

After initially filing for a preliminary injunction, Campus Stores filed an amended verified complaint alleging breach of contract, breach of the implied covenant of good faith and fair dealing, interference with advantageous business relations, and violation of M.G.L. chapter 93A, all arising from Follett's alleged breach of the 2003 Confidentiality and Non-disclosure

Agreement.  Campus Stores seeks damages, preliminary and permanent injunctive relief, and attorneys' fees and costs.

Rather than challenge the validity of the Agreement,[1] Follett argues that its actions violated neither the plain language nor the spirit of the Agreement, since Follett did not solicit Curry or utilize any confidential information during its negotiations with Curry, and since Curry clearly had no intention of renewing its contract with Campus Stores.

## III. <u>ANALYSIS</u>

### A.   <u>Standard of Review for Preliminary Injunctive Relief</u>

As this Court has previously stated,

> A preliminary injunction is an extraordinary equitable remedy.  It requires intervention by the Court on an emergency basis, without the usual careful procedures and litigation methods – the exchange of information in discovery, evidentiary hearings, the full and complete briefing of the issues.  As such the law imposes on plaintiffs the substantial burden of convincing the Court that they are likely to succeed ultimately and further, that if emergency relief is not granted, they will be 'irreparably' harmed.

<u>Boston's Children First v. City of Boston</u>, 62 F.Supp.2d 247, 253 (D. Mass. 1999) (citations omitted).

---

[1] Follett has previously acknowledged the enforceability of the Agreement.  In 2004, Follett sought permission from Campus Stores to bid on Campus Stores' contract with Nichols College, which was set to expire that year.  Campus Stores declined to grant Follett permission to bid, invoking the provisions of the Agreement.  Follett conceded and refrained from bidding on the Nichols College contract.

To prevail on a motion for a preliminary injunction, Campus Stores must satisfy the Court (1) that it is substantially likely to succeed on the merits of its claims; (2) that there is a significant risk that irreparable harm will follow absent entry of an injunction; (3) that the benefits flowing from the injunction will, on balance, outweigh the burdens imposed on defendant; and (4) that the injunction is consistent with the public interest.  <u>Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co., Inc.</u>, 378 F.3d 29, 33 (1st Cir. 2004); <u>Charlesbank Equity Fund II v. Blinds To Go, Inc.</u>, 370 F.3d 151, 162 (1st Cir. 2004).

**B.    Campus Stores' Likelihood of Success**

Likelihood of success is the brunt of the four-factor preliminary injunction framework.  <u>See</u> <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 16 (1st Cir. 1996).  Where an immediate injunction is sought, as here, the relevant likelihood of success is the likelihood that the movant would, after trial, be entitled to a permanent injunction.  <u>Ocean Spray Cranberries, Inc. v. Pepsico, Inc.</u>, 160 F.3d 58, 61 (1st Cir. 1998).

The strength of Campus Stores' breach of contract claim, its central claim on which the success of its other claims depends, is readily gleaned from the record.  Once Campus Stores establishes a breach - a likely outcome - this Court can order specific performance of the contract, among other remedies, which

would amount to an injunction barring Follett from contracting with Curry College until the close of the next round of bidding.

### 1. Plain Language Of The Agreement

Campus Stores will likely prevail on the merits of its breach of contract claim in light of the plain language of the Agreement, which prohibits Follett from doing any business with Campus Stores' host colleges "through the close of the next round of contract bidding," irrespective of whether Campus Stores is a participant in that round of bidding. Amended Verified Complaint, p. 3.

In its opposition, Follett claims that the Agreement's prohibition against doing business is only in effect where Campus Stores had "a likelihood of retaining [the] contract" after the round of bidding. This interpretation is contrary to the plain language of the Agreement, and Follett provides no other text from the Agreement nor any principle of contract interpretation that would bolster their proposed interpretation.

Indeed, from the face of the Agreement, it is irrelevant whether Curry had every intention or no intention of renewing its contract with Campus Stores. The only limitation on the non-competition clause is that it will not apply beyond the close of the first post-Agreement round of bidding. In other words, the Agreement prohibits Follett from negotiating with Curry until after Campus Stores' current contract expired in May 2005 (because this was the first time that the Curry contract came up for renewal after the Agreement was signed), whether Curry

renewed that contract with Campus Stores or entered into a new contract with another company.  Until then, Follett "agree[d] not to contact, solicit or **accept** business" from Curry.  Amended Verified Complaint, p. 3 (emphasis added).

## 2.  <u>Curry Held A "Round of Contract Bidding" During Which Campus Stores Was Invited To Bid</u>

Follett next argues that no proper "round of contract bidding" took place and that Campus Stores was never asked to submit a proposal, thus the terms of the Agreement could not have been violated.  Instead, Follett claims that Curry had a longstanding plan to terminate its relationship with Campus Stores once the existing contract expired on May 31, 2005, which would mean that Curry had no reason to solicit bids from Campus Stores, and so it did not.  Without a "round of bidding" in which Campus Stores was invited to participate, Follett argues that it was free to accept Curry's invitation to discuss commencing a business relationship.

For starters, the Agreement on its face does not require that the relevant "round of contract bidding" include Campus Stores.  The Agreement merely requires that, "with respect to the first time each [contract] come[s] up for bid or renewal following the date of this Agreement," Follett will refrain from soliciting or accepting business from Campus Stores' host colleges.  It does not matter whether or not Campus Stores participated in any negotiations or bidding to renew its contract with Curry.  Campus Stores is not out of the picture in the eyes of the Agreement until after the completion of the next contract

transition, even if Campus Stores has been out of the picture in fact for a long time.

Furthermore, affidavits submitted by both parties suggest an extended period of bidding during which Curry solicited, accepted and contemplated bids from several companies, including Campus Stores. Indeed, the very letter that Follett claims formally notified Campus Stores that Curry had unequivocally decided not to renew their contract beyond May 2005 – the letter of September 17, 2002 – actually invited Campus Stores "to propose a new agreement to the College," and asked Campus Stores to forward the proposal "as soon as possible." By any reading, this letter solicited a bid from Campus Stores. Accordingly, Campus Stores submitted two bids, neither of which was explicitly rejected until May 18, 2005. In the intervening two and a half years, Curry solicited bids from other campus bookstore operators, including Follett, thereby constituting the "round of contract bidding" that was contemplated by the Agreement.

### 3.    Disclosure of Confidential Information Is Not Relevant to Whether the Agreement Was Breached

Follett argues that the Agreement was not breached because they did not use any information, confidential or otherwise, that was disclosed to them by Campus Stores during the 2003 acquisition talks in the course of their negotiations with Curry. Moreover, Follett argues, they had no reason or opportunity to use any of the confidential information for competitive purposes

because Curry made it abundantly clear upon approaching them in 2004 that Campus Stores was not in the running for the contract.

But evidence of disclosure of confidential information is not a prerequisite to establishing that the Agreement was breached. While the Agreement does contain one express provision requiring that any confidential information "shall be held in trust and confidence," the Agreement contains a separate provision that prohibits Follett from doing business with any of Campus Stores' current host colleges, irrespective of whether or not confidential information is disclosed while conducting such business. Clearly, the Agreement contemplates the difficulty of proving that confidential information was used by the receiving party for competitive purposes, and thus the Agreement places a blanket prohibition on any business dealings with the disclosing party's customers until one full bidding cycle has run its course.

The independence of the non-disclosure and non-competition provisions of the Agreement is indisputable. It is thus irrelevant whether or not Follett disclosed or used the confidential information provided to it by Campus Stores for competitive purposes.

### C. <u>Campus Stores' Irreparable Harm</u>

"The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies." <u>K-Mart Corp. v. Oriental Plaza, Inc.</u>, 875 F.2d 907, 914 (1st Cir. 1989); <u>see also</u> <u>Ocean Spray</u>, 160 F.3d at 61. The burden of demonstrating that

-17-

the denial of interim relief is likely to cause irreparable harm rests squarely on the moving party, here Campus Stores.[2] Charlesbank, 370 F.3d at 162.

In breach of contract cases, it is difficult to show irreparable harm because monetary damages are generally adequate to compensate for the alleged breach.  Ocean Spray, 160 F.3d at 61 ("as first-year law students quickly learn, the enforcement of contracts by injunction is the exception rather than the rule"); see also Farnsworth, Contracts, § 12.4, at 852 (2d ed. 1990). But however rare, courts do issue injunctions in such cases where monetary damages cannot afford complete relief, and where the harm is difficult to quantify into a dollar figure.  See Ocean Spray, 160 F.3d at 61.

Campus Stores' task is thus to show that even a liberal, carefully calculated monetary award at the close of trial could not make them whole, that the harm that they will suffer absent a preliminary injunction is not monetarily compensable.  In one respect, the damage is already done – Curry continues to maintain that it will not continue its business relationship with Campus Stores whether or not Follett is in the picture.  This Court

---

[2] At first glance, the Agreement itself seems to provide for injunctive relief in the event of a breach.  Section 11 of the Agreement reads: "In the event of any breach or threatened breach of any provision of this Agreement, [Campus Stores] shall be entitled to immediate temporary, preliminary and/or permanent injunctive relief to prevent any such breach or threatened breach." However, the parties confirmed in open court that this provision is boiler-plate, and that it is intended merely to acknowledge that the parties to the contract contemplated injunctive relief in the event of a breach.  Moreover, injunctive relief is for the Court to grant, not a contract term for parties to negotiate.  The Court does, however, take judicial notice of this telling provision of the parties' contract.

cannot reverse Curry's decision to terminate its contract with Campus Stores, whether or not Follett's breach had something to do with that decision.  Obviously, since  Campus Stores' claims are against Follett not Curry, the Court is without power to order Curry to continue its relationship with Campus Stores.

Rather the harm alleged here is the very harm Campus Stores contracted to avoid – that Campus Stores have an opportunity to bid to renew its contract with Curry without Follett in the picture.  Indeed,  without a preliminary injunction, that harm is exacerbated:  Follett will finalize its new contract with Curry and begin operations on the Curry campus in the coming months.[3]

This harm is irreparable in nature for three reasons: First, once Curry finalizes a contract with another campus bookstore operator, Campus Stores will never again have the opportunity to bid to renew its Curry contract without competition from Follett – that one-time opportunity will have come and gone.  Further, the uninterrupted 25-year business relationship between Campus Stores and Curry will be over, and Campus Stores will never again enjoy the bargaining leverage that accompanies such a relationship.  See, e.g., K-Mart v. Oriental Plaza, 875 F.2d at 915 (preliminary injunction justified where there is "harm to goodwill").

---

[3] Joseph Flanagan, Vice President of Follett, reports that on May 9, 2005, President Quigley contacted him and informed him that Curry was ready to move forward with Follett as the new operator for its campus bookstore.

It is difficult if not impossible to quantify the harm suffered by Campus Stores; what is the monetary value of Campus Stores' lost opportunity to bid to renew its contract without its colossal competitor bidding against it?    See, e.g., id. (preliminary injunction justified where the nature of the harm is "sufficiently problematic as to defy precise dollar quantification").

To prevent this irreparable harm, the Court will enjoin Follett from contracting with Curry – in accord with the terms of the Agreement.  At that point, Curry may well reopen the bidding process without Follett in the running.  To be sure, there is no guarantee that Curry will award a new contract to Campus Stores, but that possibility would have been present even if Follett had abided by the Agreement and stayed out of the bidding process from the outset.[4]

The First Circuit has upheld the issuance of injunctive relief where the harm at issue was similarly difficult to quantify:  In K-Mart v. Oriental Plaza, 875 F.2d 907, a shopping center tenant sued its landlord for breach of lease as a result of the construction of an additional retail space in the parking

---

[4] Campus Stores makes another, less persuasive argument for immediate injunctive relief.  It argues that without an injunction it will lose "all of its business to Follett's predatory tactics."  But Campus Stores proffers no evidence that Follett has or is in the process of pursuing any of its other contracts.  Until such a time when Campus Stores can show that Follett is accepting or soliciting business from Campus Stores' other host colleges, equitable relief on that basis is unavailable.

lot.  The court upheld injunctive relief requiring the
extraordinary measure of demolishing the newly built retail space
on the ground that the harm would be exceedingly difficult to
quantify monetarily because it included loss of goodwill,
continuing encroachment, and complicated loss of revenue
calculations.

Similarly, in <u>Ross-Simmons v. Baccarat</u>, 102 F.3d 12, a
dealer of precious lead crystal sued the sole distributor of the
crystal when the distributor refused to sell its wares to the
dealer.  The First Circuit upheld the issuance of preliminary
injunctive relief because the harm suffered by the dealer was
"not accurately measurable or adequately compensable by money
damages," rendering "irreparable harm [] a natural sequel." <u>Id.</u>
at 19.  Specifically, since the dealer relied heavily on sales of
the distributor's unique crystal, absent an injunction, it would
lose an incalculable source of revenues that could not be
replaced, as well as suffer harm to its goodwill.

These two hallmarks of finding irreparable harm in breach of
contract cases, incalculable damages and loss of goodwill, are
central features of the harm suffered by Campus Stores as a
result of Follett's breach.  Indeed, this Court would encounter
the same difficulties contemplated by the district courts in <u>K-
Mart</u> and <u>Ross-Simmons</u> were it to try to compensate Campus Stores
for its losses at the close of trial.

Moreover, Campus Stores' preliminary injunction request is fortified by the strength of the merits of their underlying breach of contract claim.  Indeed, "an attempt to show irreparable harm cannot be evaluated in a vacuum; the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem."  Ross-Simons, 102 F.3d at 19; see also, E.E.O.C. v. Astra U.S.A., Inc., 94 F.3d 738, 743 (1st Cir. 1996) (the greater the likelihood of success, the less that is required in the way of irreparable harm).  Here, where the merits of the underlying claim are exceedingly strong, pressure is taken off the irreparable harm inquiry.  Thus, in the context of deciding a motion for preliminary injunctive relief, the strength of Campus Stores' breach of contract claim shadows any doubt as to the irreparability of the harm suffered by them.

IV.  **CONCLUSION**

The strength of plaintiff's breach of contract claim, coupled with serious doubts as to the adequacy of monetary relief, warrants preliminary injunctive relief.  Thus, plaintiff's motion for a preliminary injunction [document #15] is hereby **GRANTED** as follows: defendant is hereby **ENJOINED** from commencing its impending contract with Curry College and from contracting with Curry College through the close of the next round of contract bidding, as the parties' contract promises.

**SO ORDERED.**

Dated: August 2, 2005            s/ NANCY GERTNER U.S.D.J.