UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CAMPUS STORES OF MASS., INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 05-11116 NG |
| FOLLETT HIGHER EDUCATION GROUP, INC., | ) ) ) ) | |
| Defendant. | ) ) | |

**FOLLETT HIGHER EDUCATION GROUP, INC.'S
MOTION FOR CLARIFICATION AND/OR
RECONSIDERATION OF PRELIMINARY INJUNCTION AND,
<u>ALTERNATIVELY, FOR STAY PENDING APPEAL</u>
(WITH REQUEST FOR ORAL ARGUMENT)**

Defendant Follett Higher Education Group, Inc. ("Follett") hereby moves for clarification and/or reconsideration of the Preliminary Injunction entered on August 2, 2005 (the "Injunction"). As grounds therefor, Follett submits that the Court, in issuing the Injunction, appears to have been under the misimpression that Follett had not yet contracted with Curry College ("Curry") to operate the school's bookstore. In fact, Follett has been operating the Curry bookstore under contract since June 1, 2005, before the June 24 hearing on the motion for preliminary injunction and the August 2 issuance of the Injunction. Consequently, Follett had engaged in the conduct that the Injunction now seeks to prevent before the Injunction was issued. Moreover, if the Injunction is broadened to prevent Follett from continuing to operate the bookstore, Curry and its students and faculty will be without a bookstore for an indefinite period of time and at the most critical time of the year; namely, the Fall "rush" when the full student body returns to campus over the month of August for the next session. As established by the

BO1 15729451.1

accompanying affidavits of Kenneth Quigley, the President of Curry ("Second Quigley Aff."),[1] and Amanda Chase, Follett's Regional Manager ("Chase Aff."), the bookstore plays a critical role in the daily operations of the college, particularly at this time of year, and cannot easily or quickly be transitioned from one operator to another. Quite simply, if the Court intends the Injunction to bar Follett's continuing performance of the existing contract, a point which Follett seeks to clarify by way of this motion, then it will result in an extraordinary burden on Curry and its students and faculty. Accordingly, Follett respectfully asks the Court to reconsider and/or decline to grant such an injunction.

Indeed, Follett asks the Court to wholly reconsider the preliminary injunction sought by Campus Stores of Mass., Inc. ("Campus Stores"). In addition to consideration of the extreme burden that will befall Curry and its students and faculty, Follett respectfully suggests that, contrary to the Court's finding in its Memorandum and Order,[2] Campus Stores did not establish that it would suffer any irreparable harm absent an injunction. If Campus Stores were to suffer any harm, which is the subject of much dispute since it cannot establish that it would have obtained the Curry contract but for the alleged actions of Follett, then clearly it has an adequate remedy at law and could be made whole in monetary damages. In the face of President Quigley's definitive assertions that Campus Stores was not, and is not, going to receive a contract to operate the Curry bookstore, even if Follett is not in the picture, the issuance of an injunction amounts to nothing more than a pyrrhic victory for Campus Stores. Given the significant adverse impact that such an injunction would have on the public interest, represented

---

[1] The first affidavit filed by President Quigley in connection with the motion for preliminary injunction, which was dated May 31, 2005, is hereinafter referred to as the "First Quigley Aff."

[2] Memorandum and Order Re: Plaintiff's Motion for Preliminary Injunctive Relief, August 2, 2005.

BO1 15729451.1

by Curry and its students and faculty, Follett asks the Court to reconsider and deny Campus Stores' motion.

If the Court decides not to reconsider the Injunction, but rather enjoins Follett from performing under its existing contract with Curry, then Follett requests, pursuant to Fed. R. Civ. P. 62(c), a stay of any such injunction while Follett pursues any and all interlocutory appeals. In light of Follett's strong likelihood of success on appeal, the balance of harms, and the significant harm to the public interest represented by Curry and its students and faculty, a stay is appropriate.

A.  **The Court Should Not Enjoin Follett From Continuing To Perform Under Its Existing Contract With Curry College Due To The Extreme Hardship Such An Order Would Cause To The School And Its Students And Faculty.**

In reviewing the Injunction and Memorandum and Order, it appears that the Court was unaware that Follett was, prior to the time of the hearing on June 24, 2005 and the issuance of the Injunction on August 2, 2005, already operating Curry's bookstore under contract.[3] For example, on page 19 of the Memorandum and Order, this Court noted that without a preliminary injunction "Follett will finalize its new contract with Curry and begin operations on Curry campus in the coming months." Moreover, the Injunction itself enjoins Follett "from (1) *commencing* its impending contract with Curry College, and (2) *contracting with* Curry College through the close of the next round of contract bidding." (Emphasis added). In fact, Follett had, effective June 1, 2005, already contracted with Curry and commenced operating the bookstore

---

[3]  Campus Stores filed an Amended Verified Complaint prior to the hearing, which specifically alleged that Follett was now operating Curry's bookstore. (Amended Verified Complaint, ¶ 15) ("Follett has accepted business from Curry College and is now the college's bookstore operator.").

weeks prior to the June 24 hearing[4] and over two months prior to the August 2 issuance of the Injunction.

As the Court is aware, Campus Stores' contract with Curry expired on May 31, 2005 and Curry chose not to enter into a new contract with the plaintiff. Effective June 1, 2005, therefore, Curry was without a bookstore operator and, as President Quigley attests in his accompanying affidavit, the school does not operate its own bookstore with its own employees. (Second Quigley Aff. ¶ 2). Instead, Curry, as had been its desire since at least as early as July 2004, contracted with a national retailer, Follett, to take over operation of its bookstore beginning on June 1, 2005, thereby assuring that there would be no period of time without a functioning bookstore. (First Quigley Aff. ¶ 4; Chase Aff. ¶ 4). A copy of the contract executed between Curry and Follett, which calls for an initial five year term, is attached to the Chase Affidavit as Exhibit "A."

Uninterrupted bookstore operation was essential, because Curry and the bookstore do not close for the Summer. (Chase Aff. ¶ 7). Upon contracting with Curry, Follett immediately had to set about purchasing the existing inventory of textbooks, merchandise and other items at a cost of approximately $135,000, staffing the bookstore with an average of five employees, installing a point-of-sale system and various fixtures, and ordering and processing an extraordinary quantity of different textbook titles, all in an effort to be operational when the various Summer sessions commenced on campus. (Chase Aff. ¶¶ 5-8). For example, on June 18, 2005, Cambridge College began conducting a six week series of classes on Curry's Milton campus. (Chase Aff. ¶ 8). Thereafter, on July 5, 2005, Curry began its own Summer session, which is ongoing and will

---

[4] Aware that Follett was entering into a contract to begin immediately operating Curry's bookstore, Campus Stores unsuccessfully sought an emergency hearing on its motion for preliminary injunction on May 31, 2005. (Plaintiff's Emergency Motion for Immediate Hearing on Plaintiff's Motion for Preliminary Injunction on May 31, 2004).

continue through August 25. (Chase Aff. ¶ 7). In addition, there were a series of six day-long orientation programs conducted by Curry during the Summer for new students and their parents. (Chase Aff. ¶ 9). Follett has been open and serving the needs of these students, parents, faculty, and others throughout the Summer.

Significantly, Curry and the bookstore are now entering a critical and extremely busy time of year, as the full student body and faculty begin to return throughout August for the coming Fall session. (Second Quigley Aff. ¶ 5; Chase Aff. ¶ 10). This period is commonly referred to as the Fall "rush," which began on August 7, when the student athletes returned to campus, and will reach its peak when the balance of the approximately 3,300 students begin arriving the weekend of August 28, and continue as the students begin classes on September 1 and add and drop courses throughout the month of September. (Second Quigley Aff. ¶ 5; Chase Aff. ¶ 10).

To prepare for this period, Follett, like every college bookstore operator in advance of "rush," has been engaged in the time-consuming process of securing from professors the titles of textbooks adopted for Fall classes, seeking out and ordering those textbooks in the requisite quantities from a variety of sources, and receiving, processing and stocking the books so that students will be able to purchase them as they return throughout August and into September. (Second Quigley Aff. ¶ 6; Chase Aff. ¶ 11). This process is ongoing and involves approximately 750 different textbook titles, with an overall quantity in the thousands. (Chase Aff. ¶ 11). In addition, because students, many of whom live on campus without transportation, rely on the bookstore for a variety of other daily needs, Follett has been ordering and stocking a variety of merchandise, including clothing imprinted with the Curry logo, food items, and domestic and personal hygiene products. (Second Quigley Aff. ¶ 7; Chase Aff. ¶ 11). Fall rush at Curry has

been further complicated this year by the fact that over the next two weeks the bookstore will be moving from its present physical location to a temporary site elsewhere on campus, where it will remain until the new Student Center is constructed. (Chase Aff. ¶ 12).

As stated by President Quigley in his accompanying affidavit, Curry and its students and faculty will be severely and adversely impacted if Follett is enjoined from performing under its existing contract. The process of finding a new bookstore operator is a time consuming one and the college effectively will be without a bookstore while it "reviews proposals from other bookstore providers, negotiates terms and addresses written contracts." (Second Quigley Aff. ¶ 3). It is with this in mind that bookstore contracts typically require notice of termination well in advance of the actual termination date. Indeed, the former contract between Curry and Campus Stores called for a six month advance termination notice and the current contract between Curry and Follett calls for a 120 day advance termination notice. (Chase Aff., Exh. "A" at ¶ 3.1). It is not an exaggeration to suggest that Curry will be without a bookstore for an extended period of time if Follett is enjoined from continuing to perform under the contract. This dilemma will be further exacerbated by the fact that the college is entering Fall rush, when it needs a bookstore most.

Exposing Curry and its students and faculty to this significant risk is particularly inappropriate in this case where President Quigley has definitively stated that Campus Stores is not going to be the college's next bookstore operator, even if Follett is out of the picture. President Quigley's statements have been unequivocal and this represents the undeniable and uncontroverted state of the facts in this case. Given President Quigley's position and the potential harm to the public interest represented by Curry and its students and faculty, Follett

6

respectfully requests that the Court decline to enjoin it from continuing to perform under the existing contract.

**B.     Contrary To The Court's Ruling In Its Memorandum And Order, Campus Stores Cannot Establish That It Will Suffer Irreparable Harm If Follett Is Not Enjoined From Performing Under Its Contract With Curry College.**

According to the Memorandum and Order, the Court determined that Campus Stores has suffered irreparable harm through the loss of the opportunity to attempt to secure a new contract with Curry free of any competition from Follett. (Memorandum and Order, pp. 19-20). While this analysis has surface appeal, it cannot withstand scrutiny. Indeed, the flaw in this analysis is evident from the answer to the related question posed by the Court: "what is the monetary value of Campus Stores' lost opportunity to bid to renew its contract without its colossal competitor bidding against it?" (Memorandum and Order, p. 20). The answer is that is has no value, unless Campus Stores can establish that it would have secured a new contract with Curry but for the alleged actions of Follett. If Campus Stores cannot establish this critical element, then it has suffered no harm, irreparable or otherwise, and is not entitled to any relief, at law or in equity. If, on the other hand, it can establish this critical element (which it cannot), then its damages are the profits it would have realized from a new contract. Because any such profits would be subject to quantification and Campus Stores could be made whole through monetary damages, it has an adequate remedy at law. In either case, Campus Stores cannot establish the requisite irreparable harm for the issuance of an injunction.

In reality, what the Court has taken for irreparable harm is not the difficulty that Campus Stores will have with the quantification of harm, but rather the difficulty that Campus Stores will have in establishing that it has suffered any harm at all. While Follett certainly agrees that Campus Stores cannot establish that it will suffer any harm as a result of the alleged actions of

Follett, this fact simply leads to the conclusion that Campus Stores cannot satisfy one of the other elements required for an injunction; namely, a likelihood of success on the merits. While that alone should be fatal to Campus Stores' application for injunction, it is simply irrelevant for purposes of the irreparable harm analysis.

Ultimately, the only harm that Campus Stores conceivably could have incurred as a result of Follett's alleged breach is the loss of profit from a potential new contract with Curry--not the loss of a *possible* opportunity to secure such a new contract. Putting aside for the moment that Campus Stores cannot possibly establish that it has a likelihood of succeeding in proving that it would have secured such a new contract with Curry but for the alleged actions of Follett (the critical proximate cause element of all of Campus Stores' claims), even if it could, it would have an adequate remedy at law since it could be made whole in monetary damages. In short, even if one accepts, *arguendo*, that Campus Stores suffered any damages at all, those damages are calculable.

In addition, contrary to the Court's suggestion in the Memorandum and Order (pp. 20-21), the present case is wholly distinguishable from both K-Mart v. Oriental Plaza, 875 F.2d 907 (1st Cir. 1989) and Ross-Simmons v. Baccarat, 102 F.3d 12 (1st Cir. 1996), two of the rare breach of contract cases in which the First Circuit upheld an award of injunctive relief. In K-Mart, the First Circuit upheld a mandatory injunction where the landlord constructed a new retail building in a parking lot in front of K-Mart in violation of the terms of the parties' lease. In holding that the lower court properly determined that K-Mart had suffered irreparable harm and that the offending building should be torn down, the court relied on several factors: (1) that injuries to real estate interests are frequently deemed irreparable, due to the uniqueness of real estate; (2) that harm to goodwill is the type of harm that is not readily measurable or adequately

compensable in damages, and that K-Mart's goodwill had been harmed by the fact that the offending new building obstructed the view of its store and detracted from the uniform appearance or "presentation" that the national retailer seeks to attain at all of its locations; (3) the fact that the loss of revenues from diminished visibility, restricted access, and less convenient parking were sufficiently difficult to quantify; and (4) the extraordinary length of K-Mart's lease, which still had up to 35 years to run. K-Mart, 875 F.2d at 915. The present case does not share any of the K-Mart factors. There is no real estate involved. Moreover, contrary to this Court's suggestion, there is no goodwill involved. As addressed above, any revenue that Campus Stores even conceivably might have lost is straight-forward and calculable. Finally, the duration of any new contract that Campus Stores possibly could have secured with Curry would have been of limited duration. Accordingly, it is difficult to imagine that the K-Mart case could be any more dissimilar from the one at bar.

The same can be said for Ross-Simmons, in which the First Circuit upheld another mandatory injunction requiring a dealer of prestigious lead crystal to continue to sell its wares to the plaintiff, a discount retailer. In so doing, the First Circuit, after expressly noting that it was a close case, determined that Ross-Simmons had established that it would suffer irreparable harm in the form of damage to its goodwill caused by the fact that it no longer carried the defendant's prestigious lead crystal as an attraction to potential customers of its bridal registry service. Ross-Simmons, 102 F.3d at 19-20. Specifically, the court relied upon a series of cases that "recognized that the loss of a prestigious brand or product line may create a threat of irreparable injury if it is likely that customers (or prospective customers) will turn to competitors who do not labor under the same handicap." Id. at 20 (citations omitted). Once again, the case at bar does not share any of the Ross-Simmons characteristics. Here, there is no element of uniqueness or

prestige, never mind the level of uniqueness or prestige that could potentially give rise to a finding of irreparable harm. Still further, there is no element of goodwill here, notwithstanding the Court's suggestion to the contrary.

According to the Memorandum and Order (p. 19), the goodwill in the present case is represented by "the uninterrupted 25-year business relationship between Campus Stores and Curry." As the Court viewed it, unless Follett is eliminated from competition that relationship "will be over, and Campus Stores will never again enjoy the bargaining leverage that accompanies such a relationship." (Memorandum and Order, p. 19). This analysis is faulty for several reasons. First, Campus Stores' relationship with Curry was coming to an end whether Follett was present or not, given that the contract with the school was expiring on May 31, 2005. Second, Campus Stores was going to have competition from a national retailer in its effort to secure a new contract whether Follett was present or not, as evidenced by the fact that Curry sought out a bid from Barnes & Noble. (First Quigley Aff. ¶ 3). Third, that 25-year relationship was what it was, and it cannot seriously be maintained that the relationship was altered by the fact that there was one particular other competitor bidding for the contract. Either Campus Stores' performance over the years enhanced its relationship with Curry and gave it an advantage or it did not (and President Quigley's original affidavit seriously calls that into question). Finally, while a contractual exclusivity provision may be many things, it would be ironic, especially from a public policy standpoint, to suggest that it enhances a party's goodwill, since it amounts to the elimination of a competitor from the pool of companies that a party's customer can consider as alternatives.

In sum, Campus Stores cannot establish that this case falls within the small minority of cases where a contract can be enforced by an injunction. See Ocean Spray Cranberries, Inc. v.

Pepsico, Inc., 160 F.3d 58, 61 (1st Cir. 1998) ("the enforcement of contracts by injunction is the exception rather than the rule").  Campus Stores cannot establish that it will suffer any irreparable harm if the injunction is not granted.  Therefore, Follett respectfully requests that the Court reconsider its ruling.

**C.    Due To Its Inability To Show That It Suffered Any Harm As A Result Of The Alleged Actions Of Follett, Campus Stores Cannot Establish That It Has A Likelihood Of Success On the Merits Of Any Of Its Claims In This Action.**

In the Memorandum and Order, the Court, in reaching the conclusion that Campus Stores established a likelihood of success on the merits of its claims, focused solely on the elements of duty and breach--whether Follett had a contractual obligation and, if so, whether it breached that obligation.  However, as Follett detailed at length in its original opposition, all of Campus Stores' claims, which include breach of contract, intentional interference with advantageous relations, breach of the covenant of good faith and fair dealing, and violation of Chapter 93A, further require that Campus Stores satisfy the elements of causation and damages—whether Campus Stores suffered actual damages and, if so, whether those damages were caused by Follett's alleged actions.  (Opposition of Follett Higher Education Group, Inc. to Campus Stores of Mass., Inc.'s Motion for a Preliminary Injunction, pp. 10-14).  The Court did not address either of these elements and Campus Stores certainly did not (and cannot) establish a likelihood of satisfying them.

It is insufficient for Campus Stores to show that if Follett were not one of the potential vendors under consideration to run the Curry bookstore after Campus Stores' contract expired on May 31, 2005, that *maybe* there would have been a different RFP process, *maybe* Campus Stores would have received consideration as a potential bidder, and *maybe* Campus Stores would have ultimately been awarded the contract.  This is pure speculation (actually, totem-pole speculation)

11

and wholly insufficient to establish causation. What Campus Stores was required to establish was that it had a likelihood of succeeding in proving that it would have won the contract to be Curry's bookstore operator after May 31, 2005, but for the alleged actions of Follett. This Campus Stores did not (and cannot) do.

Instead, Campus Stores attempted to cobble together a variety of innocuous and inconsequential incidents (i.e., a request for a donation to a charitable golf tournament and an acknowledgement of generosity at a donor dinner) and suggest that as a whole they reveal that it still had a chance, even if it was an extremely slim one, to win the Curry contract. While Follett would suggest that the overwhelming weight of the evidence is to the contrary, even if one accepts the evidence proffered by Campus Stores on its face, it still falls far short of establishing that Campus Stores was likely to succeed in proving that it would have won the Curry contract, but for the alleged actions of Follett.

In the end, however, one cannot view the evidence proffered by Campus Stores in a vacuum. Nor can one simply dismiss the affidavit proffered by President Quigley, which is fatal to Campus Stores' claims. While Campus Stores may not like it, it cannot negate the fact that President Quigley, the ultimate decision maker, has definitively stated that he had no intention of entering into a new contract with Campus Stores after May 31, 2005, whether Follett was in the mix or not. It is not sufficient to simply dismiss President Quigley's statements as being the product of Follett's alleged influence or interference. Campus Stores has an affirmative duty to proffer reliable evidence from which it could establish that it had a likelihood of succeeding in proving that it would have won the Curry contract, but for the alleged actions of Follett. It did not (and cannot) do so.

Accordingly, Campus Stores did not (and cannot) satisfy the causation and damages elements of its claims and did not satisfy that it has a likelihood of success on the merits of its claims. On these grounds, therefore, Follett again respectfully requests that the Court reconsider its ruling.

**D.     If The Court Is Not Inclined To Reconsider The Issuance Of An Injunction, A Stay Should Be Granted While Follett Pursues An Interlocutory Appeal.**

If the Court decides not to reconsider the Injunction and instead enjoins Follett from performing under its existing contract with Curry, then a stay of any such injunction should issue, pursuant to Fed. R. Civ. P. 62(c), while Follett pursues its appeal.

The criteria to be satisfied for a stay under Fed. R. Civ. P. 62(c) are very similar to those required for the issuance of an injunction. These are: (1) a likelihood of success on the merits of the appeal; (2) irreparable harm; (3) the balance of harms favoring the moving party; and (4) the public interest. Martinez-Rodriguez v. Jiminez, 537 F.2d 1, 2 (1st Cir. 1976); Buntzman v. Springfield Redevelopment Authority, 918 F. Supp. 29, 29-30 (D. Mass. 1996). Follett can satisfy all of these criteria.

For the reasons stated in its original opposition and in detail above in support of its request for reconsideration, Follett is likely to succeed on the merits of its appeal. Specifically, Follett has a strong likelihood of establishing on appeal that the Court wrongly decided that Campus Stores had proven that it would suffer irreparable harm if an injunction did not issue. If Campus Stores suffered any harm (which is highly questionable), it would amount to the loss of profit from any new contract with Curry, for which it has an adequate remedy at law and can be made whole through monetary damages. Moreover, Follett is likely to demonstrate on appeal that the Court incorrectly decided that Campus Stores had established a likelihood of success on the merits of its claims. Campus Stores has not established that it is likely to succeed in proving

that it would have secured a new contract with Curry, but for the alleged actions of Follett. As such, Campus Stores has not established the elements of causation and damages required in all of its claims and has not established a likelihood of success on the merits. For these reasons, Follett is likely to succeed on appeal.

Follett also will be irreparably harmed if a stay is not granted. If enjoined from performing under its contract with Curry, Follett will have no ready avenue of recourse for the resulting loss of business when the injunction is ultimately vacated or overturned. If a stay does not issue, Curry will be forced to enter into a contract with a third party in order to meet its bookstore needs. When the injunction is vacated or overturned, therefore, Follett will not be in a position to return to performing under the contract; Curry will no longer have any need for Follett's services. Follett will then be left to the vagaries of pursuing Campus Stores for damages for the wrongful issuance of the injunction. In sum, Follett will not have an adequate remedy at law if a stay does not issue.

Indeed, the balance of harms clearly favors Follett. Campus Stores has nothing to gain from the denial of a stay pending appeal. President Quigley has definitively stated that Campus Stores will not be Curry's bookstore operator, whether or not Follett is in the picture. Therefore, Campus Stores will enjoy what amounts to a pyrrhic victory if the injunction is enforced. Follett loses. Curry and its students and faculty lose. Campus Stores gains nothing. There is nothing to be served by such an outcome.

It is the harm that will befall Curry and its students and faculty if the injunction is enforced during appeal that overwhelmingly warrants the issuance of a stay. As detailed above and in the accompanying affidavits, Curry will be without a bookstore for an indefinite period of time if the injunction is enforced. Moreover, it will be without a bookstore during the busiest

and most critical time of year, the Fall "rush." As such, the public interest weighs heavily in favor of the issuance of a stay.

## CONCLUSION

For all of the foregoing reasons, Follett respectfully requests that the Court clarify and/or reconsider the Preliminary Injunction issued on August 2, 2005 and thereafter deny Campus Stores' request for the same. Alternatively, Follett requests that the Court issue a stay of any such injunction, pursuant to Fed. R. Civ. P. 62(c), while it pursues any and all interlocutory appeals.

Respectfully submitted,

FOLLETT HIGHER EDUCATION GROUP, INC.

By its attorneys,

/s/ Mark Berthiaume
Mark A. Berthiaume, B.B.O. No. 041715
Timothy E. Maguire, B.B.O. No. 630773
Seyfarth Shaw LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone: (617) 946-4800

DATED: August 8, 2005

## REQUEST FOR ORAL ARGUMENT

Defendant Follett Higher Education Group, Inc. hereby moves, pursuant to Local Rule 7.1(D), for oral argument on this motion. As grounds therefor, Follett wishes to be heard on the

present motion and believes that oral argument will assist the Court in its consideration of the same.

          Respectfully submitted,

          FOLLETT HIGHER EDUCATION GROUP, INC.

          By its attorneys,


          /s/ Mark Berthiaume
          Mark A. Berthiaume, B.B.O. No. 041715
          Timothy E. Maguire, B.B.O. No. 630773
          Seyfarth Shaw LLP
          World Trade Center East
          Two Seaport Lane, Suite 300
          Boston, MA 02210-2028
          Telephone: (617) 946-4800

DATED: August 8, 2005