UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAMPUS STORES OF MASS., INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> FOLLETT HIGHER EDUCATION ) <br> GROUP, INC., ) <br> ) <br> Defendant. ) | C.A. No. 05-11116 NG |

## AFFIDAVIT OF AMANDA CHASE

Under oath, I hereby state as follows:

1. My name is Amanda Chase. I am currently employed by Follett Higher Education Group, Inc. ("Follett").

2. The information contained in this affidavit is based upon my personal knowledge and upon information and belief. To the extent that any portion of this affidavit is based upon information and belief, I believe it to be true.

3. I am currently employed by Follett as a Regional Manager, a position I have held since September 2000. In this position, I am responsible for managing the operation of Follett bookstores at 19 educational institutions throughout the Northeast section of the United States. The store managers and directors who are on site and involved in day-to-day operations of the various stores report directly to me.

4. On or about June 1, 2005, Follett took over operation of the bookstore at Curry College in Milton, Massachusetts ("Curry"), pursuant to a written contract, a copy of which is attached hereto as Exhibit "A." Since that time, I have been directly involved in overseeing operation of the Curry bookstore.

BO1 15729569.1

5. At the time Follett began operating the Curry bookstore, we purchased the existing inventory, which included clothing and merchandise imprinted with the Curry name and logo, adopted textbooks, and convenience items, from Curry for approximately $135,000. We have also installed a point-of-sale system, which includes cash registers and inventory management software, and various fixtures.

6. In addition, we have staffed the store with an average of approximately five employees and are in the process of hiring two additional full-time staff members and approximately eight temporary employees to assist in the Fall "rush," which is the period of time when new and existing students return in the latter part of August and purchase textbooks and other items for the Fall semester.

7. During the entire Summer, Curry and the bookstore have been open and conducting business. Curry's own Summer session runs from approximately July 5 to August 25 and is attended by several hundred students. This year, professors adopted over 100 different textbook titles for classes during the Summer session, which Follett purchased, stocked and sold to students. As the Summer session is ongoing, the bookstore continues to service these students and faculty on a daily basis.

8. In addition, for six weeks beginning on or about June 18, 2005, Cambridge College conducted Summer classes on Curry's campus, again attended by several hundred students. These Summer classes each last one week, and students are required to purchase the textbooks adopted for those classes on the Monday of each week. As with Curry's own Summer students, Follett purchased, stocked and sold the adopted textbooks to these Cambridge College students.

9. Curry also conducts a series of six day-long orientation programs during the Summer for incoming students and their parents. Follett assisted in these programs and serviced the attending students and their parents.

10. We are also currently in the middle of the busiest time of year for a college bookstore – preparation for the Fall "rush." During the month of August it is necessary to make all of the necessary arrangements for the arrival of students and faculty for the Fall semester. Curry's first semester classes begin on September 1, 2005, and students arrive throughout the month of August.

11. In preparation for the commencement of Curry's fall semester, Follett has been busy ordering, obtaining and processing the approximately 750 different textbook titles that professors have adopted for classes in the coming Fall semester, in addition to ordering and stocking a wide assortment of merchandise and other items.

12. Preparation for Fall "rush" has been further complicated at Curry this year by the fact that the bookstore will be moving over the next couple of weeks from its current location in the Hafer Academic Building to a temporary site on the first floor of a student dormitory elsewhere on campus, where it will remain until the school's new Student Center is constructed. In addition to running the bookstore on a day-to-day basis, therefore, Follett has been planning the design and build-out of the temporary space and preparing for the transfer, which will have to be done in a timely and efficient manner in order to be ready to service the needs of the returning students by August 27.

Signed under the pains and penalties of perjury this 4th day of August, 2005.

_____
Amanda Chase

# BOOKSTORE OPERATING AGREEMENT BETWEEN
# CURRY COLLEGE
# AND FOLLETT HIGHER EDUCATION GROUP, INC.

This Bookstore Operating Agreement ("Agreement") is made as of June 1, 2005 between Curry College ("School") and Follett Higher Education Group, Inc. ("Follett").

Intending to be legally bound, School and Follett agree:

1.  *Store.* Subject to all the terms and conditions in this Agreement, Follett shall operate a bookstore ("Store") for School.

2.  *Term.* This Agreement takes effect June 1, 2005, and continues, unless sooner terminated in accordance with Section 3, until May 31, 2010. Thereafter, unless either party notifies the other in writing at least 120 days before expiration of the initial term, or the then-current renewal term, of its intention not to renew, this Agreement shall automatically renew for successive one-year renewal terms under the terms and conditions set forth in this Agreement.

3.  *Early Termination.* Either party may terminate this Agreement:

3.1 With or without cause by giving the other party at least 120 days prior written notice of termination.

3.2 For material nonperformance by the other party (documented, in case of nonperformance by Follett in accordance with Section 7.4) on at least 90 days prior notice.

3.3 Immediately upon written notice if the other party becomes insolvent or becomes the subject of a bankruptcy proceeding that remains undismissed for 60 days.

4.  *Rights Upon Termination, Expiration or Non-Renewal.* Upon any termination, expiration or non-renewal of this Agreement:

4.1 All rights of either party accrued prior to such termination, expiration or non-renewal shall be unaffected.

4.2 School shall pay Follett the unamortized book value (calculated on the straight-line method from the in-service date[s] over the greater of 8 years or until expiration of this Agreement) of both all Store Remodeling (as defined in Section 5) and the one-time payment (as defined in Section 6.18) paid by Follett.

4.3 School shall purchase, or cause to be purchased, the Store Merchandise then on hand under the same terms as purchased by Follett under Section 9.1

4.4 All Capital Equipment purchased by Follett will remain the property of Follett.

4.5   Upon termination of this Agreement for any reason, Follett shall forthwith (i) surrender and deliver to the School possession of all premises and property of the School occupied or under the possession, custody or control of Follett, (ii) deliver to School all materials and supplies, keys, contracts and documents, and such other accountings, papers and records pertaining to this Agreement as School shall request, and (iii) provide, during a temporary period not to exceed sixty (60) days following such termination, such managerial assistance as School may require in order to assure an orderly transfer of the operation of the bookstore to a successor.

5.   *Store Improvements.*

5.1   Follett shall spend up to a total of █████████ to improve the Store in accordance with this Section 5. This expenditure may include furniture, trade fixtures, and equipment, including point-of-sale equipment, that are readily removable ("Capital Equipment") and Follett and third-party design and project management services, third-party architectural and engineering services, cabling and infrastructure, build-out, floor and wall coverings, decorating, lighting, and fixtures, that are not readily removable (together with investments described in Section 5.1, "Store Remodeling"). Capital Equipment and Store Remodeling each include all replacements, additions and extensions paid for by Follett, whenever installed. The Capital Equipment and Store Remodeling together comprise the "Store Improvements."

This commitment shall cover the costs of relocation of the current bookstore to and from its temporary locations and the completion of the new bookstore space in the Student Center.

5.2   Follett shall prepare complete plans and specifications for any future Store Remodeling for review and approval by School, and shall work closely with School to develop mutually acceptable plans ("Plans").

5.3   When School has given final approval to the Plans, Follett shall submit an installation and/or construction schedule to School for approval. School shall review and comment on the Plans and schedule in a reasonable time frame to allow the project completion date to be met.

5.4   Any physical changes to the Store space shall meet or exceed the requirements of the Americans with Disabilities Act ("ADA") and all other applicable codes, laws and regulations, and shall be in accordance with Follett's Design Intent documents.

6.   *General Rights and Responsibilities of Follett.*

6.1   Follett shall operate the Store in accordance with the highest standards and commercial practices in the college bookstore industry.

6.2   Follett shall operate the Store 12 months per year. The name of the Store shall not change. The Store's normal hours of operation and holiday closing schedule shall be as

approved in writing by School after consultation with Follett; hours of operation during registration periods, the first two weeks of classes, and all special campus events, shall be extended to coincide with demand.

6.3  Follett shall have the exclusive right, free from any alternate source endorsed, licensed or otherwise approved or supported by School (whether on campus, by catalog or through electronic commerce, efollett.com including hyperlinks to alternate sources) to buy, sell, and distribute (including the right to select vendors) merchandise and services traditionally offered in college and university bookstores, including but not limited to: textbooks, electronic course materials, class and alumni rings and jewelry, clothing (whether or not emblematic), school supplies, desk and dorm accessories, gifts, souvenirs, graduation regalia (sale and rental) and announcements, course-adopted software and paper and electronic custom anthologies, and textbook buybacks. Follett shall also have right of first refusal to fulfill any distance learning instructional and ancillary materials required by School during the term of this Agreement.

This Section 6.3 does not prohibit occasional sales by student groups or student government organizations that do not materially impact Store sales. Follett understands and agrees to comply with the School's exclusive beverage agreement with the Coca-Cola Corporation.

This section 6.3 does not prohibit sales by athletes, student groups and student government/organizations, fund raising groups, and entities with whom the College enters into agreements for limited use of its campus and facilities (such as Cambridge College and similar entities).

6.4  School grants Follett the right, until the expiration of the term of this Agreement, subject to School's standards, to use the School's seal, logotype, and associated trademarks and service marks on the Store's Internet site, signage and collateral materials, and stationery, soft goods, notebooks, pens, pencils, decals and other goods traditionally sold in college and university bookstores; provided, however, that School shall first have the right to review and approve (which approval shall not be unreasonably withheld) usage, design, content, color, and other details used by Follett, and that Follett shall not permit any other entity or person to use, distribute or sell any products or advertisements bearing said marks. Except as provided herein, Follett recognizes and acknowledges that it has no other rights with respect to School's trademarks and tradenames and all rights associated therewith, including goodwill attributable thereto, and Follett agrees not to register or attempt to register in any manner said trademarks and tradenames or any similar names. Follett shall not assert any interest in School's trademarks and tradenames or in any rights associated therewith, including goodwill attributable thereto, at any time during or after the termination of this Agreement.

6.5  In order to secure property in the Store, Follett shall cooperate with School in providing Store security, theft prevention, and emergency procedures in case of fire or casualty. In cooperation with School Security, Follett shall create and maintain a Store security plan acceptable to School for textbook buyback, rush and other special events.

6.6  Follett shall not cause School's students, faculty, or staff suspected of theft or disturbance to be arrested by public authorities (except in emergencies) or prosecuted without prior consultation with School.

6.7  In its operation of the Store, Follett shall pay its bona fide financial obligations to School and to third parties in a timely manner.

6.8  Follett shall collect and pay any sales tax, income tax, and all other local, state and federal taxes on Follett's operation (except property taxes on the Store).

6.9  Follett shall obtain and maintain at its sole expense, and in its name, all necessary licenses and permits required to perform the services described herein.

6.10  Follett shall abide, and require its employees to abide, by applicable School regulations and policies. School shall provide Follett with copies of applicable policies, and timely inform Follett of any changes.

6.11  Follett shall abide by all federal, state and local laws applicable to its operation.

6.12  In performing this Agreement, Follett shall not discriminate based on sex, race, national origin, religion, color, sexual orientation, veteran status, disabled veteran status, age, disability protected under the ADA or any other category protected by federal, state or local law.

6.13  Follett shall be responsible to School for any and all losses or liability incurred on, or damages to, property which is owned by School that is in Follett's possession, custody or control, and/or any and all losses, liability or damages which are caused by Follett or its employees or agents.

6.14  Follett will make its corporate representatives reasonably available to School to discuss and resolve any operational issues.

6.15  Follett shall be responsible for daily cleaning of the Store interior, including provision of basic janitorial equipment and supplies, mopping, sweeping, dusting, stripping and waxing of floors, dusting, rug extraction, and removal of light trash to School-provided receptacles, and maintaining the premises in a condition that is satisfactory to School, and consistent with that provided by competitive, first rate national higher education bookstore providers.

6.16  Follett will offer School faculty and staff a ▇▇ discount on all purchases over $1.00, excluding textbooks, sale merchandise and academically discounted software. Follett will offer all School departments a ▇▇ discount on purchases of supplies over $1.00, excluding textbooks, sale merchandise and academically discounted software.

6.17  Follett will provide ▇▇▇ annually in textbook scholarships during the term of this Agreement.

6.18 Follett will provide a one time contribution of ▓▓▓▓▓ to the School's General Scholarship Fund.

7. *General Rights and Responsibilities of School.*

7.1 School will provide and maintain an appropriate, safe and habitable location, in accordance with all applicable laws and regulations, in retail-ready condition, for the Store Improvements and ongoing Store operations. Except for the Store Remodeling provided by Follett in accordance with Section 5, School shall be responsible for furnishing appropriate lighting, flooring, plumbing, power and HVAC. School shall also keep the building in which the Store is located in compliance with all fire, building and electrical codes and regulations, including regulations governing fire alarms, smoke detectors, fire extinguishers, fire suppression and sprinkler systems, water pressure, plumbing and electrical service. School shall be responsible for any loss resulting from failure of the building to meet applicable building codes and regulations. If the School relocates all or any part the Store operations, School will provide Follett with at least 90 days advance notice of the relocation and will reimburse Follett, within 30 days after Follett's invoice, for Follett's cost of the relocation (except for the relocation of the current bookstore to and from its temporary location and the completion of the new bookstore in the Student Center.)

School shall be responsible for damages suffered by Follett which are directly caused by School's negligent failure to comply with applicable building codes and regulations, or negligent maintenance of the building; provided, however, that such liability shall not include indirect or consequential damages. If the School relocates all or any part of the Store operations after its relocation to the new student center building (which relocation is now anticipated to occur after the construction of such building, likely to be completed in 2006 or 2007), School will provide Follett with at least 90 days advance notice of the relocation and will reimburse Follett, within 30 days after Follett's invoice, for Follett's reasonable costs incurred in the relocation, provided that Follett submits to School a written estimate of said moving costs within 60 days before the relocation.

7.2 School will name a representative authorized to advise Follett of School's approvals, consents and instructions under this Agreement.

7.3 School may prohibit sale at the Store of any item it finds offensive or inappropriate.

7.4 School may request that Follett review and correct any aspect of its performance with which School is dissatisfied, and at School's request Follett will meet with School to discuss and/or implement the corrective action.

7.5 School shall provide the following services to the Store in accordance with School's building standards at no cost to Follett:

 a) Security of persons and property in the same manner provided for other School premises;

    b) Internal and external building maintenance, including, but not limited to: plumbing, electric, light bulbs, HVAC and other mechanical systems, fire protection, roof membrane and structure, floors, walls, ceilings, windows and doors.
    c) Pest control services on the regular School schedule;
    d) Lost and found service as regularly provided by School;
    e) Parking for Follett's employees in common with other authorized parkers in a location approved and provided by School (Follett's employees must abide by all applicable parking regulations);
    f) Participation in any debit or credit card, voucher program, or other payment or financial aid service now or hereafter made available by School to its students or to local merchants;
    g) Local telephone/data service including all equipment and lines (telephone toll charges to be charged to Follett at the same rate charged at cost);
    h) Reasonable access to School's telecommunications and network systems as required to install, at Follett's sole expense, T1 lines and associated connectivity for Follett's point-of-sale systems; and
    i) Building standard utilities.

7.6    School will require its faculty and staff to provide Follett with timely and accurate textbook adoption information.

7.7    Follett will extend credit to School for financial aid and departmental charge accounts in accordance with the terms set forth in Follett's standard credit application. School will furnish to Follett all required information and will pay all accounts within 30 days of invoice, or will pay applicable late charges as provided in the credit application.

## 8. *Bookstore Personnel.*

8.1    Follett will furnish sufficient adequately trained personnel to provide efficient and courteous service to customers, including sufficient substitute personnel in case of employee absence. To support Follett's "People First"® culture, Follett will provide ongoing training in customer service. Follett will formally recognize and reward employees who provide superior customer service.

8.2    School may participate in interviewing and evaluation of Follett's Store Manager should the need arise to fill the position. Follett's selection of the Store Manager is subject to School's approval.

8.3    At no time will any person employed by Follett be deemed an employee of School. Follett is solely responsible to pay all wages, taxes and benefits owed to persons who perform services for School on behalf of Follett, and to comply with all applicable laws and regulations relating to the employment of said persons.

9.  *Bookstore Sales.*

9.1  On commencement of this Agreement, Follett shall purchase from School all salable merchandise in the Store, including new textbooks, used textbooks, trade, reference and technical books, general merchandise, and any verified usable credits with publishers or vendors. Follett will cause all such merchandise to be inventoried by an independent firm. School may observe the inventory if desired. Within 120 days after the completion of the inventory, Follett shall pay School for the merchandise as follows:

   a)  New Textbooks
       1.  New textbooks adopted for the next academic term in quantities not exceeding course requirements will be purchased at standard industry discounts or cost. New textbooks purchased that are not utilized in the next academic term and not returnable to the publisher will be charged back to Follett.
       2.  New textbooks not adopted for the next academic term, or adopted but in excess of course requirements, will be purchased at the current wholesale price.

   b)  Used Textbooks
       1.  Used textbooks adopted for the next academic term in quantities not exceeding course requirements will be purchased at 50% of the current new text selling price. Used textbooks purchased that are not utilized in the next academic term and not returnable to the wholesaler will be charged back to Follett.
       2.  Used textbooks not adopted for the next academic term, or adopted but in excess of course requirements, will be purchased at current wholesale price.

   c)  Trade, Reference and Technical Books ("Trade Books")
       1.  Trade Books that have been purchased during the past academic year and are returnable to the publisher will be purchased at standard industry discounts or cost.
       2.  Trade Books not meeting these requirements will be purchased at a price agreeable to School and Follett.

   d)  General Merchandise
       1.  General merchandise traditionally sold in college bookstores, purchased in the past academic year, in salable condition, and not in excessive quantities, will be purchased at standard industry discounts or cost.
       2.  General merchandise not meeting these requirements will be purchased at a price agreeable to School and Follett.

9.2    In operating the Store, Follett will charge industry standard, competitive and fair prices, which at present are as follows:



9.3    Follett will expediently process text requests placed after the adoption deadline.

9.4    Follett shall purchase used textbooks year round. Follett shall purchase used textbooks adopted for the next academic term in quantities sufficient to meet course requirements at not less than ▓▓▓ of the current new retail price. Follett shall purchase used books not adopted for the next academic term or in excess of course requirements at wholesale prices prevailing in School's locality.

9.5    Follett will accept returns in accordance with the following policies:

   a) Non-textbook items in resalable condition may be refunded or exchanged at any time with original receipt.
   b) Textbooks in resalable condition may be refunded with receipt within seven (7) calendar days from the start of classes or within two (2) days of purchase thereafter, including during summer term.
   c) Textbooks purchased during the last week of classes or during exams may be sold back under the book buyback policy.
   d) Computer software may be returned if it is unopened and shrink-wrapped.

9.6    In operating the Store, Follett shall accept as a minimum, MasterCard, Visa, Discover and American Express charge cards. Follett will pay all merchant charges associated with acceptance of these credit cards.

## 10.    *Commission.*

10.1    Follett shall pay commission to School in an annual amount equal to sum of:



REDACTED

10.2  If in any full year during the term of this Agreement, commission payments to School calculated in accordance with Section 10.1 are less than ████ ("Guarantied Annual Income") Follett will pay School an additional amount necessary to bring total payments to School for that year up to the Guarantied Annual Income. This Section 10.2 shall not apply in any year in which School enrollment drops by 5% or more from the prior year, or in which online or brick-and-mortar technological or competitive changes significantly affect sales by the Store.

10.3  Follett will keep complete and accurate records of all Store transactions in accordance with industry accounting practices and will provide a summary statement of Store operations to School quarterly. Follett will preserve records of store operations for 5 years from the transaction date, and will make them available for review, audit and verification by School at the Store upon request on reasonable advance notice during ordinary business hours other than during Store "rush" periods.

10.4  Follett shall pay the commission calculated in accordance with Section 10.1 quarterly, twenty days after the end of the quarter. Any other payment required to be made by Follett to School under this Agreement shall be made within thirty days of receipt of invoice. Follett will make any payments due under Section 10.2 within 90 days after the end of the year. In case of termination of this Agreement other than at a year-end, payments under Section 10.2 shall be prorated to the actual date of termination.

## 11. *Insurance.*

11.1  During the term of this Agreement, Follett shall keep in force, at its own expense, at least the following insurance, all in accordance with this Section 11:

   a) Comprehensive General Liability having a combined single limit of not less than $1,000,000 per occurrence including, but not limited to contractual liability and products/completed operations;
   b) Business Automobile Liability having a combined single limit of not less than $1,000,000 per occurrence covering claims arising out of ownership, maintenance, or use of owned or non-owned automobiles;
   c) Worker's Compensation insurance having limits not less than those required by applicable statute;
   d) Employer's Liability in the amount of at least $1,000,000.
   e) Umbrella Liability in the amount of $3,000,000 per occurrence.
   f) Commercial Property coverage, including but not limited to an appropriate level of business interruption insurance.

11.2  School, its affiliates, officers, directors, trustees, volunteers, and employees shall be named as additional insureds under the Commercial General Liability policy and the Business Automobile Liability policy.

11.3  Follett shall furnish industry standard Certificate[s] of Liability Insurance to School showing the coverage required by this Section 11 within 30 days after execution of this Agreement or before Follett takes possession of the Store, whichever is earlier. The Certificate[s] shall provide that the issuing company will endeavor to mail written notice to the Certificate Holder (School) within 30 days in the event of any policy cancellation or termination.

11.4  School will notify Follett of any flood plain zoning changes affecting the Store within 30 days of receiving notice of such change from any source.

11.5  If School causes any work to be performed by a third party on the building housing the Store, then School will provide Follett an industry standard Certificate of Liability Insurance from the third party's insurance company(ies) showing Follett as an additional insured under the third party's Commercial General Liability policy and Business Automobile Liability policy. Both policies shall show combined single limits of $1,000,000 per occurrence.

11.6  Before causing or permitting any work to be performed by any third party on the building in which the Store is located, School will provide Follett an industry standard Certificate of Liability Insurance showing Follett as an additional insured under the third party's Commercial General Liability policy and Business Automobile policy having combined single limits of at least $1,000,000 per occurrence.

## 12. *Indemnification.*

12.1  To the fullest extent permitted by the law, Follett shall defend, indemnify and hold harmless School, its Board of Trustees, affiliates, officers and employees from any and all claims, suits, actions, damages, judgments, and costs (including reasonable attorney fees), arising out of any: (i) damage, destruction or loss of any property (including but not limited to School's property); or (ii) injury to or death of any person (including but not limited to any employee of School); which results from or arises out of negligent or willful acts or omissions of Follett, its officers, agents and employees, in the performance of this Agreement or (iii) any liability, verdict, cost, judgment, settlement, assessment, or penalty incurred by School in connection with any claim or assertion that School is a joint employer of any persons Follett hires, contracts with, or directs or causes to perform any services for School.

12.2  To the extent permitted by applicable law, School shall defend, indemnify and hold harmless Follett, its affiliates, directors, officers and employees from any and all claims, suits, actions, damages, judgments, and costs (including reasonable attorney fees) arising out of any: (i) damage, destruction or loss of any property (including but not limited to Follett's property); or (ii) injury to or death of any person (including but not limited to

any employee of Follett); which results from or arises out of negligent or willful acts or omissions of School, its officers, agents or employees, in the performance of this Agreement.

13. **_Limitation of Liability._** With the exception of the parties' indemnification obligations and any infringement of either party's intellectual property rights, neither party shall be liable to the other party for any indirect damages whatsoever, including but not limited to lost profit, lost savings, and incidental or consequential damages, arising out of the performance of this Agreement.

14. **_Confidentiality._**

14.1 The School shall use reasonable care, unless otherwise mandated by law or court order, to safeguard Follett's Confidential Information received during the course of this Agreement. "Confidential Information" means any information, including information regarding Follett's divisions or affiliates, which is disclosed by Follett to School, in any form, and which is treated by Follett in good faith as confidential, and: (i) is conspicuously marked "confidential," or words to that effect at disclosure; or (ii) is reasonably identified to School in writing as being "confidential" within 30 days after disclosure. Follett will direct any such Confidential Information to the School to the parties and addresses provided in Section 17."

14.2 If Follett has access to student "educational records" as that term is defined in §20 U.S.C. 1232g(a)(4) of the Family Educational Rights and Privacy Act of 1974 (FERPA), it will comply with all applicable obligations under FERPA and represents it understands that disclosure of such records to an unauthorized person may be a violation of law and could subject School to penalties under FERPA. Follett also acknowledges that it may not disclose such records to persons other than the student or authorized representatives of School unless and until School has obtained prior and specific student authorization. In addition to complying with FERPA and applicable law, Follett will use reasonable care to safeguard and prevent the disclosure of such records to any third party, and will use such records only for the purpose of performing its obligations under the Agreement, to the extent permitted by law. Follett understands that a violation of this provision is a material breach of this Agreement and that School may terminate the Agreement immediately or exercise any other contractual or legal remedies.

15. **_Independent Contractor Status._** The relationship of the parties is that of independent contractors, and no tenancy, partnership, joint venture, agency, fiduciary or other relationship is created. Neither party may order any goods or services, incur any indebtedness, or enter into any obligation or commitment on the other party's behalf.

16. **_Nonassignability._** Neither party may assign or sublet this Agreement in whole or in part without the prior written consent of the other party, except that either party may assign this Agreement in its entirety to an affiliate that controls, is controlled by or is under common control with such party.

17. **Notice.** Notices required or permitted by this Agreement shall be deemed given when received if sent by recognized overnight courier or first class mail, postage prepaid, to the following address, or such other address as the party may specify by notice:

To School:
Kenneth K. Quigley, Jr.
President
Curry College
1071 Blue Hill Road
Milton, Massachusetts 02186

To Follett:
Thomas Christopher
President
Follett Higher Education Group
1818 Swift Drive
Oak Brook, Illinois 60523

With copy to:
Follett Corporation
2233 West Street
River Grove, Illinois 60171
Attn: General Counsel

16. **Severability.** If any provision of this Agreement is finally adjudicated illegal, invalid, in excess of the authority of either party hereto, or otherwise unenforceable, then such provision shall be severed, and the remainder of this Agreement shall remain in force as if such adjudicated provision were never included in this Agreement.

17. **Integrated Agreement.** This Agreement: (i) is the sole expression of the understanding of the parties with respect to operation of the Store, (ii) supersedes all prior statements and agreements with respect thereto, and (iii) may not be modified, amended or waived except in writing signed by an authorized representative of the party against whom such modification, amendment or waiver is sought to be enforced.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date first written above.

FOLLETT HIGHER EDUCATION GROUP, INC.

By: _____
Thomas A. Christopher
President

CURRY COLLEGE

By: _____
Kenneth K. Quigley, Jr.
President